UNDER 21 et al., Individually and on Behalf of All Others Similarly Situated, Respondents-Appellants, v CITY OF NEW YORK et al., Appellants-Respondents.

SALVATION ARMY, Respondent, v EDWARD I. KOCH, as Mayor of the City of New York, et al., Appellants.

AGUDATH ISRAEL OF AMERICA, Respondent, v CITY OF NEW YORK et al., Appellants.

First Department, May 7, 1985

### APPEARANCES OF COUNSEL

*Alfred Weinstein* of counsel (*Dennis deLeon, Michael S. Adler* and *Paul Rephen* with him on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for defendants-appellants.

*John P. Hale, P. C.,* for Under 21 and others, respondents-appellants.

*Joseph Polizzotto* of counsel (*William J. Moss, Edward P. O'Keefe* and *Lindsay L. Wood* with him on the brief; *Cadwalader, Wickersham & Taft,* attorneys), for Salvation Army, respondent.

*David Zwiebel* for Agudath Israel of America, plaintiff.

*O. Peter Sherwood* of counsel (*Rosemarie Rhodes, Lawrence S. Kahn* and *Debra L. Raskin* on the brief; *Robert Abrams, Attorney-General,* attorney), for State of New York, *amicus curiae.*

*Thomas B. Stoddard* of counsel (*Thomas B. Stoddard* and *Madeline Kochen,* attorneys), for New York Civil Liberties Union, *amicus curiae.*

*David L. Benetar* of counsel (*Stanley Schair* with him on the brief; *Benetar, Isaacs, Bernstein & Schair,* attorneys), for The New York Chamber of Commerce and Industry, *amicus curiae.*

*Robert L. Becker* and *Rosaria Esperon* for Puerto Rican Legal Defense and Education Fund, Inc., *amicus curiae.*

*Richard E. Feldman* for Lambda Legal Defense and Education Fund, Inc., *amicus curiae.*

### OPINION OF THE COURT

Asch, J.

Three actions were brought challenging the validity of Executive Order No. 50 issued by New York City Mayor Edward I. Koch on April 25, 1980, which, *inter alia,* forbids those who secure contracts with New York City from refusing to hire people simply on the basis of "sexual orientation or affectional preference" even if they can perform the job in a satisfactory manner.

The legal issues raised in all three are virtually the same, and Special Term treated the actions identically in disposing of the various motions then pending before it. The court agreed with the plaintiffs' position that Executive Order No. 50 violated the New York State Constitution.

Invoking the recent opinion of the Court of Appeals in *Subcontractors Trade Assn. v Koch* (62 NY2d 422) the court, at nisi prius, stated that in issuing the executive order the Mayor had "usurped the power of the City Council" and "create[d] new social policy absent a proper legislative basis". It then concluded that Executive Order No. 50 was "unconstitutional as being *ultra vires* and an unlawful usurpation of legislative power."

The dissent, as did Special Term, also depends on the argument that the Mayor has encroached on the legislative prerogative. In our judgment, the validity of Executive Order No. 50

rests on a fundamental constitutional foundation. The Mayor does not, under the circumstances here presented, exercise legislative authority. Indeed, the rights of the individuals affected should be enforced as a matter of constitutional entitlement. Their rights, which the Mayor chose to reaffirm explicitly, are those which he is obligated to enforce under his oath of office.

It is quite easy to succumb to the strong emotions which are frequently evoked by the issue of homosexuality. But it is not necessary to vindicate homosexuality as a way of life for this court to uphold Executive Order No. 50.

It is agreed by all the parties that the executive order does not make it compulsory for the agency to hire a person whose sexual orientation conflicts with the specific job description for which he or she is to be employed. The order does not mandate an affirmative act. It simply prohibits job discrimination on the basis of a nonfunctional factor. All the parties agree that under Executive Order No. 50, a contracting agency is not in violation if it refuses to hire in those instances where sexual orientation or affectional preference is a bona fide occupational qualification. Where sexual proclivity does not relate to job function, it seems clearly unconstitutional to penalize an individual in one of the most imperative of life's endeavors, the right to earn one's daily bread.

These requirements of the executive order have been acquiesced in and presumably satisfied by plaintiffs for a number of years, apparently without dire consequences. Organizations operating under the same moral imperatives do not seem to find conflict between signing these contracts and furnishing secular services on behalf of New York City.

Executive Order No. 50 does not prohibit the exercise of religious belief. This order does not attempt to infringe on the right of any religious organization to maintain its religious tenets. Nor is it a restriction on a private group using its own funds for its own purposes. However, when any organization contracts to perform secular services for the city, the Mayor has the power and the authority, and the constitutional obligation, to require nondiscriminatory hiring policies based exclusively upon fitness for job performance.

Agreeing with the plaintiffs' position that Executive Order No. 50 exceeds the Mayor's authority under the New York State Constitution, the court below essentially relied on four Court of Appeals decisions: *Matter of Broidrick v Lindsay* (39 NY2d 641), *Rapp v Carey* (44 NY2d 157), *Matter of Fullilove v Beame* (48 NY2d 376), and especially *Subcontractors Trade Assn. v Koch*

(62 NY2d 422, *supra*). Each of these cases examined the permissible scope of executive power. All four, together, constitute a body of legal precedent marking when an executive act enters improperly into the legislative domain.

I agree with Special Term, and essentially with the dissent, that the most recent of the four Court of Appeals decisions, *Subcontractors* (*supra*), recapitulates the principles applicable to the matter before us, but I disagree as to its application to the present controversy.

*Subcontractors* (*supra*) concerned the constitutionality of Mayor Koch's Executive Order No. 53, which required the City of New York to award 10% of all construction contracts to businesses either operating in poor neighborhoods or employing many poor people. In analyzing the order, the court expressed its approach for determining the constitutionality of antidiscrimination measures adopted by executive officers: the "remedial plan" test. An executive may not, said the court (p 428), create "a remedial plan for which the executive never received a grant of legislative power." It then invalidated Executive Order No. 53 as just such a "remedial plan". "Where, as here, the executive adopts a *plan* specifying that a certain percentage of city construction contracts are to be allotted to a particular group or category of business enterprise, he has gone beyond his function of implementing general Charter-conferred powers. Such action constitutes an exercise of legislative power" (*supra,* at p 429; emphasis added).

If the court below had applied the *Subcontractors* test to Executive Order No. 50, that case would have been distinguished on its facts and the order would have almost certainly been upheld. Executive Order No. 50 is not a "remedial plan" as that term is used in *Subcontractors* (*supra*).

In the other cases alluded to, the "remedial plans" which were invalidated established rigid numerical preferential quotas which favored some groups at the expense of others. In all three, the plans sought to make amends for past community discrimination by a restitution of current government benefits.

Executive Order No. 50 establishes no preferential treatment for any group. It merely requires would-be contractors to pledge not to discriminate against certain groups, provided the member can do his or her job. There are no quotas, no preferences and no affirmative acts which are sought to be imposed.

Executive Order No. 50 is grounded in the constitutional equal protection principles which bar arbitrary and invidious discrimination. Thus, under US Constitution 14th Amendment

and the NY Constitution, article I, § 11, the City of New York is already prohibited from engaging in discrimination on the basis of sexual orientation or affectional preference. Section 1 of the 14th Amendment reads in pertinent part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

This amendment contains no recitation of protective categories but protects everyone. Although the Supreme Court through case law has emphasized certain distinctions, i.e., race, national origin and alienage, presumptively "suspect" or invidious under the 14th Amendment (*see, Loving v Virginia,* 388 US 1), it has repeatedly emphasized the fundamental, all-encompassing scope of the 14th Amendment. Thus, in 1982, the court said: "The Equal Protection Clause was intended to work nothing less than the abolition of all caste-based and invidious class-based legislation" (*Plyler v Doe,* 457 US 202, 213). In 1983, the court noted: "The concept of equal justice under law requires the State to govern impartially * * * A sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective" (*Lehr v Robertson,* 463 US 248, 265).

In promulgating Executive Order No. 50, the Mayor, as chief executive officer of the City of New York, sworn to upheld the Constitution of the United States and of New York State, had authority to assure that the city did not discriminate against any of its citizens. Not only does he have authority, he is *obligated* to enforce the fundamental constitutional principles. Thus, the executive order represents a valid exercise of his charter powers in fulfillment of his responsibility to prevent invidious discrimination in employment by the city and those who contract to perform city services.

Equal protection principles bar State officials from engaging in unconstitutional discrimination (*see, Norwood v Harrison,* 413 US 455). Also, the 14th Amendment limits not only direct action of the city, but indirect action as well. Thus, in *Norwood v Harrison (supra,* p 466), the United States Supreme Court held that the State of Mississippi could not lend textbooks to private schools that traditionally excluded black students, stating that "[a] State may not grant the type of tangible financial aid here involved if that aid has a significant tendency to facilitate, reinforce, and support private discrimination." Here, assistance

furnished by the city to the plaintiffs is essential to the furnishing of the social services provided by plaintiffs and thus falls within the parameters of *Norwood. Norwood* would therefore clearly prevent the city from financing and supporting contractors who would receive city funds and then freely engage in invidious discrimination. Thus, fundamental equal protection principles prohibit the city in its allocation of city funds or city contracting from engaging in or otherwise supporting invidious discrimination of any kind against any citizen.

In *Norton v Macy* (417 F2d 1161, 1167), the Court of Appeals for the District of Columbia in a case involving a homosexual appellant asserted that an employee may be fired only if there is "some reasonably foreseeable, specific connection between an employee's potentially embarrassing conduct and the efficiency of the service".

In *Gay Law Students Assn. v Pacific Tel. & Tel. Co.* (24 Cal 3d 458, 595 P2d 592) the Supreme Court of California held, *inter alia,* that an arbitrary exclusion of qualified individuals from employment opportunities by a State-protected public utility is violative of State constitutional rights of those individuals and that protection against the arbitrary foreclosing of employment opportunities lies close to the heart of the protection against "second class citizenship" which the equal protection clause was intended to guarantee. Thus, the California Supreme Court noted (p 467) that "past decisions of this court establish that this general constitutional principle applies to homosexuals as well as to all other members of our polity; under California law, the state may not exclude homosexuals as a class from employment opportunities without a showing that an individual's homosexuality renders him unfit for the job from which he has been excluded."

It also asserted that courts in other jurisdictions reached similar conclusions, citing *Matter of Kimball* (33 NY2d 586). In that case an attorney who had been convicted of sodomy in Florida and had been denied admission to the Bar by the Appellate Division, appealed to the Court of Appeals, which reversed the Appellate Division and remitted to the Appellate Division for reconsideration of the application. Thus, the dissenting opinion of the Appellate Division in *Matter of Kimball* (40 NY2d 252, 258, *supra*) said: "While the majority avoids the issue of homosexuality and homosexual acts as a purported badge of unfitness to practice law, we prefer to meet that issue squarely. To us it seems clear that the social and moral climate in New York (and probably throughout the Western World) has

in recent years changed dramatically with respect to homosexuality and consensual homosexual acts. Today they are generally viewed as no more indicative of bad character than heterosexuality and consensual heterosexual acts".

On November 18, 1983, Governor Cuomo issued an executive order specifically forbidding discrimination by State agencies on the basis of "sexual orientation" (Executive Order No. 28, State of New York, Nov. 18, 1983). In the preamble to the order, Governor Cuomo stated that in issuing it he was merely "reiterating the law set down by the Constitution of the United States and the Constitution of the State of New York" (9 NYCRR 4.28).

The New York State Attorney-General has noted in a formal opinion: that the Human Rights Law may be silent on sexual orientation *"does not mean* that such discrimination is 'permitted' as a matter of State policy" (1978 Opns Atty Gen 115, 117; emphasis added).

In *People v Onofre* (51 NY2d 476), the Court of Appeals held that the Penal Law violated defendant's constitutional rights to privacy and equal protection of the law when it prohibited noncommercial, cloistered personal sexual conduct between consenting adults. In that case, in footnote 3 on page 488, the court noted: "We express no view as to any theological, moral or psychological evaluation of consensual sodomy * * * That is not the issue before us. The issue before us is whether, assuming that at least at present it is the will of the community (as expressed in legislative enactment) to prohibit consensual sodomy, the Federal Constitution permits recourse to the sanctions of the criminal law for the achievement of that objective. The community and its members are entirely free to employ theological teaching, moral suasion, parental advise, psychological and psychiatric counseling and other noncoercive means to condemn the practice of consensual sodomy. The narrow question before us is whether the Federal Constitution permits the use of the criminal law for that purpose."

A fortiori, mere homosexual preference or orientation, which has never been a crime, cannot be used as the basis for denying "any person" the equal protection of the law.

The precise problem with which we are presented is simple in outline. The Supreme Court of the United States has not as yet come to grips with it, although various aspects of the problem have "swirled nationwide for many years." (*See, e.g., Texas A&M v Gay Student Servs.,* __ US __ [Apr. 1, 1985]; *Board of Educ. v National Gay Task Force,* 470 US __, 53 USLW 4408

[Mar. 26, 1985]; *Rowland v Mad Riv. Local School Dist.,* Feb. 25, 1985.) However, Justice Brennan, dissenting, with Justice Marshall, from the denial of certiorari, in *Rowland (supra),* expressed, most cogently, the constitutional predicate upon which we rest.

"Apart from the First Amendment, we have held that '[a] State cannot exclude a person from * * * any * * * occupation * * * for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.' *Schware v. Board of Bar Examiners,* 353 U.S. 232-239 (1975). And in applying the Equal Protection Clause, 'we have treated as presumptively invidious those classifications that disadvantage a "suspect class," or that impinge upon the exercise of a "fundamental right." ' *Plyler v. Doe,* 457 U.S. 202, 216-217 (1982); see also *id.,* at 245 (BURGER, C.J. dissenting) ('The Equal Protection Clause protects against arbitrary and irrational classifications, and against invidious discrimination stemming from prejudice and hostility'). Under this rubric, discrimination against homosexuals or bisexuals based on their sexual preference raises significant constitutional questions under both prongs of our settled equal protection analysis.

"First, homosexuals constitute a significant and insular minority of this country's population. Because of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena. Moreover, homosexuals have historically been the object of pernicious and sustained hostility, and it is fair to say that discrimination against homosexuals is 'likely * * * to reflect deep-seated prejudice rather than * * * rationality.' *Id.,* at 216. State action taken against members of such groups based simply on their status as members of the group traditionally has been subjected to strict, or at least heightened, scrutiny by this Court.

"Second, discrimination based on sexual preference has been found by many courts to infringe various fundamental constitutional rights, such as the rights to privacy or freedom of expression. Infringement of such rigid rights found to be 'explicitly or implicitly guaranteed by the Constitution,' *San Antonio School District v. Rodriguez,* 411 U.S. 1, 33-34 (1973), likewise requires the State to demonstrate some compelling interest to survive strict judicial scrutiny. *Plyler, supra,* at 217. I have previously noted that a multitude of our precedents supports the view that public employees maintain, no less than all other citizens, a fundamental constitutional right to make 'private choices involving family life and personal autonomy.' *Whisenhunt v.*

*Spradlin,* 464 U.S. 965, 971 (1973) (BRENNAN, J., dissenting from denial of certiorari). Whether constitutional rights are infringed in sexual preference cases, and whether some compelling state interest can be advanced to permit their infringement, are important questions that this Court has never addressed, and which have left the lower courts in some disarray. Cf. *Carey v. Population Services International,* 431 U.S. 678, 688, n. 5, 694, n. 17 (1977)."

The essential argument urged by respondents and most forcefully presented by our dissenting colleague is that Executive Order No. 50 usurps the authority of the Legislature. But this argument missed the point that appellants' position is predicated on a constitutional right. The dissent states: "The question which we are called upon to decide is one of executive power." With this evaluation, I heartily agree. But the source of the Mayor's authority in this instance, in fact, his obligation, rests in constitutional due process and equal protection rather than an assertion of legislative authority. The Mayor is not seeking to *create* a new human right, nor to broaden the panoply of rights expressed in the Human Rights Laws or the Equal Employment Opportunity Act or other enactments. He is simply affirming what is a bare-bone right under the Federal and New York State Constitutions, namely, that agencies, standing in the shoes of the State, cannot prohibit the employment of individuals on the basis of personal proclivities which have nothing to do with whether they can perform the job adequately.

For judicial support, the dissenting Justice resurrects *Youngstown Co. v Sawyer* (343 US 579), which, with typical candor, he describes as "the once famous but now almost forgotten steel seizure case". That case, as well as "separation of powers", have been virtually discarded, in the Federal catalogue of authority, as vestigial relics of the great constitutional battles involving the serious challenges hurled against private property during the thirties and forties of this century. And the idea of separation of powers has been relied upon for State court holdings in fewer and fewer desultory cases.

If the Legislature passed a law which permitted projects funded by public moneys to discriminate on the basis of sexual preference rather than job qualification, it is doubtful whether such statute could meet even a minimal rationality standard under the Constitution. Obviously, then, the issue is not whether there is an encroachment on the authority of the Legislature.

The injection of "separation of powers" in this case, where there is no invasion of legislative prerogative but rather an assertion of the constitutional right of those affected, is inappropriate. "In the late-twentieth century, it is commonplace that a strict doctrine of separation of powers is not only a theoretical absurdity and a practical impossibility" (*see,* Friedmann, Law in a Changing Society, at 382-383 [2d ed 1972], and material there cited).

The Mayor, in promulgating Executive Order No. 50, did no more than make express the policies and principles already firmly embedded in our State and Federal Constitutions.

Accordingly, the orders and judgments (each one paper) of the Supreme Court, New York County (Klein, J.), entered on October 5, 1984, and the order and judgment (one paper) of the Supreme Court, New York County (Klein, J.), entered October 4, 1984, which granted each plaintiff's motion for summary judgment invalidating elements of Mayoral Executive Order No. 50 and regulations promulgated thereunder, should be modified, on the law, without costs, the motions for summary judgment denied, and upon search of the record (CPLR 3212 [b]), summary judgment granted to defendants declaring that Mayoral Executive Order No. 50 and regulations promulgated thereunder are constitutional and valid, and otherwise affirmed.

BLOOM, J. (dissenting). Plaintiffs in all three actions are nonprofit charitable organizations operating under religious auspices. They are under contract with New York City to perform certain social services mandated upon the city. The services which they have contracted to perform are paid for in part through charitable contributions and in part by funding from the city. They seek, by separate actions, to declare invalid Executive Order No. 50 issued by the Mayor of the city on April 25, 1980. The purpose, as declared in section 1 of the executive order, is to "ensure compliance with the equal employment opportunity requirements of City, State and Federal law in City contracting". In one respect, however, it differs markedly from the City and State Human Rights Laws (Administrative Code of City of New York § B1-1.0 *et seq.;* Executive Law § 290 *et seq.*) and the Federal Equal Employment Opportunity Act (42 USC § 2000e *et seq.;* Presidential Executive Order No. 11246 as amended). It precludes discrimination in employment because of "sexual orientation or affectional preference", a category not included either in the Human Rights Laws or the Equal Employment Opportunity Act.

The background against which the executive order was adopted is of importance. Bills have been introduced in the City Council over a period of 10 or more years to amend the City Human Rights Law to include within the protected categories those whose "sexual preference" was different from what is perceived to be the norm in our society. On each occasion the bill died in committee.

When the contracts between plaintiffs and the city approached expiration, negotiations commenced for new agreements. In each instance the Bureau of Labor Services, the administrative agency vested with the obligation of monitoring Executive Order No. 50, insisted that any new agreement contain a provision barring discrimination against all the categories of persons enumerated in Executive Order No. 50. The plaintiffs in these three actions then sought declaratory judgments decreeing that the executive order was invalid. Each plaintiff sought a temporary injunction restraining enforcement of Executive Order No. 50, summary judgment declaring the executive order invalid and permanent injunctive relief. Special Term granted the motion to the extent of awarding plaintiffs summary judgment, holding that the issuance of the executive order was a legislative act and thus, beyond the power of the executive. I agree. Accordingly, I would affirm.

We may start with the premise that discrimination whatever its cause and regardless of against whom it may be directed is not alone ugly; it is an evil to be eliminated. However, the question of morality is not before us. The question which we are called upon to decide is one of executive power.

Ours is a tripartite form of government. "The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy" (*Myers v United States,* 272 US 52, 293 [Brandeis, J., dissenting], quoted in *Youngstown Co. v Sawyer,* 343 US 579, 629 [Douglas, J., concurring]). Determining where the powers of the Legislature and the executive begin and end and where they may overlap in the context of the problem presented, is a task far from simple of solution. "Just what our forefathers did envision, or would have envisioned had they foreseen modern conditions, must be devined from materials almost as enigmatic as the dreams Joseph was called upon to interpret for

Pharaoh" (*Youngstown Co. v Sawyer,* 343 US 579, 634 [Jackson, J., concurring]). It is a task which, nevertheless, we are required to pursue.

In the endeavor to ascertain the limits of executive power, we are aided by the discussion in the concurring opinion of Mr. Justice Jackson in the once famous but now almost forgotten steel seizure case (*Youngstown Co. v Sawyer,* 343 US 579, 635-638, *supra*). In that matter a labor dispute occurred between the steel industry and the union of steel workers. The country was then in the throes of the Korean conflict. President Truman referred the dispute to the Federal Wage Stabilization Board. That body was unable to achieve a settlement. When the union gave notice of a nationwide strike the President, by executive order, without any basis therefor in statutory authority and predicated upon a presidential finding that it was necessary to avoid a national catastrophe, directed the Secretary of Commerce to take possession of the steel mills and to operate them. The industry challenged the seizure and sought a temporary injunction restraining the Secretary from taking possession of the mills. The District Court granted the industry a temporary injunction. In joining in the affirmance by the Supreme Court, Mr. Justice Jackson, in his classical dissertation on executive power, stated (pp 635-638):

"1. When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. In these circumstances, and in these only, may he be said (for what it may be worth) to personify the federal sovereignty. If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power. A seizure executed by the President pursuant to an Act of Congress would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.

"2. When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law.

"3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system."

We think the dismissal of *Youngstown Co. (supra)* by our brethren in the majority as a "vestigial relic" of the great constitutional controversies of two generations ago somewhat cavalier. Indeed, less than a year ago it was cited by our Court of Appeals to support the proposition that in our tripartite form of government the power of the executive is limited. "Respect for this structure and the system of checks and balances inherent therein requires that none of these branches be allowed to usurp powers residing entirely in another branch" (*Subcontractors Trade Assn. v Koch,* 62 NY2d 422, 427, *supra*). Its teaching has been applied both to Mayors (*Subcontractors Trade Assn. v Koch,* 62 NY2d 422, *supra; Matter of Fullilove v Beame,* 48 NY2d 376; *Matter of Broidrick v Lindsay,* 39 NY2d 641) and to Governors (*Matter of Fullilove v Carey,* 48 NY2d 826; *Rapp v Carey,* 44 NY2d 157). In *Subcontractors Trade Assn. v Koch* (62 NY2d 422, *supra*) an executive order issued by the Mayor mandating that 10% of all construction contracts be given to "locally based enterprises" was struck down on the ground that no legislative base existed therefor and, absent such base, the executive order constituted an unconstitutional usurpation of legislative power. The two *Fullilove* cases dealt with executive orders, one by the Governor and the other by the Mayor requiring affirmative action programs. In the case of the City of New York, the executive order required a contractor to submit a written plan of affirmative action before any contract for city or city-assisted construction work could be awarded. In the case of the State, the executive order required that all State contracts contain a provision for affirmative action and that before such contracts were awarded the contractor was required to submit an affirmative action program. Despite the underpinning of the broad declaration of purpose contained in the Human Rights Laws (Executive Law §§ 290, 291; Administrative Code of City of New York §§ B1-1.0, B1-7.0) these executive orders were deemed to be an unconstitutional usurpation of legislative power by the executive. In *Rapp v Carey* (44 NY2d 157, *supra*), the Governor promulgated an executive order requiring certain classes of

employees of the State and of independent agencies such as public authorities over which the Governor had no control, to file detailed financial statements with the Board of Public Disclosure and to abstain from certain types of political and business activity. In holding the executive order invalid, the court noted that an act of the Legislature toward the same end might well be within constitutional limits. However, since the acts sought to be compelled and prohibited were not barred either by the State Constitution or statute, the endeavor to compel and prohibit by executive fiat was improper. In *Matter of Broidrick v Lindsay* (39 NY2d 641, *supra*), the matter at issue was the authority of the Deputy Mayor-City Administrator to compel affirmative action by prescribing percentages of minorities required to be employed by contractors engaged in the performance of work for the city. While noting that the Administrative Code prohibited discrimination in employment by those entering into contracts with the city, the court held that the City Administrator was powerless to prescribe a remedial device not embraced by statute.

True it may be that Executive Order No. 50 covers an area not included in any of the cases discussed above. However, it is evident from the struggles waged in the City Council with respect to amendment of the law on the proposed inclusion among the protected categories of those added by Executive Order No. 50, that the matter is one of legislative concern. While the Mayor is given broad powers by New York City Charter chapter 1, those are limited to administration. They do not include the power to legislate.

The constitutional argument raised by the city is concededly troublesome. In most of the cases cited, the issues raised include 1st and 14th Amendment rights. The one case in which the Supreme Court has ruled (*Board of Educ. v National Gay Task Force,* 470 US ___, 53 USLW 4408) resulted in an affirmance, by an equally divided court, of a Tenth Circuit determination. That holding struck down that portion of an Oklahoma statute which authorized dismissal of teachers who advocated or encouraged homosexuality (729 F2d 1270). The Court of Appeals held the statute overly broad on the ground that it penalized speech deserving of constitutional protection. The affirmance by the Supreme Court was by a 4 to 4 vote, Mr. Justice Powell not participating. In light of the nature of the affirmance, it has no value as precedent. *Rowland v Mad Riv. Local School Dist.* (___ US ___, 105 S Ct 1373) posed similar questions. There, the Sixth Circuit held that neither 1st nor 14th Amendment rights were violated (730 F2d 444). The Supreme Court, by a vote of 6 to 2

denied certiorari. Indeed, Mr. Justice Brennan, in his dissent in *Rowland,* was of the opinion that certiorari ought be allowed "[b]ecause determination of the appropriate constitutional analysis to apply in such a case continues to puzzle lower courts and because this Court has never addressed the issues presented" (__ US, at p __, 105 S Ct, at p 1373). Still more recently the Supreme Court again denied certiorari in a matter which has, at least, tangential bearing on the subject before us (*Ulane v Eastern Airlines,* 742 F2d 1081, *cert denied* __ US __ [Apr. 15, 1985]). There, a transexual pilot who had undergone a sex change operation was fired by his employer. He sought relief under the Federal Equal Employment Opportunity Act (EEOA). The District Court granted relief. The Seventh Circuit reversed and directed the entry of judgment in favor of the defendant. What makes the case of particular interest in the context of the problem before us is the discussion in the Circuit Court opinion of the endeavor, by members of Congress, to amend the EEOA to prohibit discrimination based upon "affectational or sexual orientation" (*supra,* p 1085) and the failure of these attempts with the result that both it, and the District Court were of the opinion that the EEOA did not protect homosexuals (p 1084).

Although many cases involving homosexual activity have been called to our attention, some of which are cited in the majority opinion, we know of no definitive, final and conclusive authority which holds that homosexual conduct is within the category of activity protected by the 14th Amendment. In the absence of such authority, we are of the opinion that Executive Order No. 50 cannot be sustained on the basis of constitutional underpinning. It may well be that the Federal Constitution prohibits recourse to the imposition of criminal sanctions for acts of consensual sodomy (*People v Onofre,* 51 NY2d 476). That merely is a recognition of the right of privacy. It does not extend to the Mayor the power to legislate.

Moreover, in these proceedings no person claims the invasion of a constitutional right. Such rights are not to be determined in the abstract. Only where there is some specific claimed deprivation of such right will the issue have matured sufficiently to warrant determination on constitutional grounds.

The failure of the City Council to act in a matter within its sphere of action has not created a vacuum into which the Mayor may step. The remedy for the Legislature's failure to act or for faulty action lies, as Mr. Justice Holmes long admonished, at the ballot box. It does not reside with the executive or the courts.

Finally, even if ultimately it be held that discrimination bottomed upon "sexual orientation or affectional preference" is invidious and proscribed by the 14th Amendment, we have grave doubt that an executive order is the means whereby such prohibition can be effected. In that connection we note that *Subcontractors Trade Assn. v Koch* (62 NY2d 422, *supra*), *Matter of Fullilove v Beame* (48 NY2d 376, *supra*), *Matter of Fullilove v Carey* (48 NY2d 826, *supra*), and *Matter of Broidrick v Lindsay* (39 NY2d 641, *supra*), all dealt with the evil of racial discrimination, an odious practice outlawed by the equal protection clause of the 14th Amendment (*Brown v Board of Educ.,* 347 US 483) and of the 5th Amendment (*Bolling v Sharpe,* 347 US 497). Nonetheless, the executive was held powerless to proscribe it if, in the process, it usurped a legislative function.

Accordingly, the orders and judgments of the Supreme Court, New York County (Alvin Klein, J.), entered October 5, 1984, and the order and judgment of the Supreme Court, New York County (Alvin Klein, J.), entered October 4, 1984, should be affirmed.

CARRO, J. P., and KASSAL, J., concur with ASCH, J.; BLOOM, J., dissents in an opinion.

Three orders and judgments (three papers), Supreme Court, New York County, one of which was entered on October 4, 1984, and the other two entered on October 5, 1984, modified, on the law, without costs and without disbursements, the motions for summary judgment denied, and upon search of the record (CPLR 3212 [b]), summary judgment granted to defendants declaring that Mayoral Executive Order No. 50 and regulations promulgated thereunder are constitutional and valid, and otherwise affirmed.