[805 NYS2d 354]

Daniel Hernandez et al., Respondents, v Victor L. Robles, as City Clerk of the City of New York, Appellant.

First Department, December 8, 2005

## APPEARANCES OF COUNSEL

*Michael A. Cardozo, Corporation Counsel*, New York City (*Leonard Koerner, Marilyn Richter* and *Ronald E. Sternberg* of counsel), for appellant.

*Lambda Legal Defense and Education Fund*, New York City (*Susan L. Sommer, David S. Buckel* and *Alphonso David* of counsel), and *Kramer Levin Naftalis & Frankel LLP*, New York City (*Jeffrey S. Trachtman* and *Norman C. Simon* of counsel), for respondents.

*Whiteman, Osterman & Hanna LLP*, Albany (*Michael Whiteman* and *Heather D. Diddel* of counsel); *Jenner & Block LLP*, Washington, DC (*William M. Hohengarten* and *Paul M. Smith* of counsel); *American Psychological Association*, Washington, DC (*Nathalie F.P. Gilfoyle* of counsel); and *National Association of Social Workers*, Washington, DC (*Carolyn I. Polowy* and *Sherri Morgan* of counsel), for American Psychological Association and others, amici curiae.

*Simpson Thacher & Bartlett LLP*, New York City (*Joseph F. Tringali, Robert J. Pfister* and *Paul A. Saso* of counsel), for Asian American Legal Defense and Education Fund and others, amici curiae.

*Jay Weiser*, New York City (*Kate Webber, Robert H. Cohen, Kristin Bebelaar* and *Alvan L. Bobrow* of counsel), for The Association of the Bar of the City of New York; *Bruce J. Wagner*, Albany, for American Academy of Matrimonial Lawyers-New York Chapter; *William D. Frumkin*, New York City, for National Employment Lawyers Association/New York; *Richard M. Wallace*, Ithaca, for Tompkins County Bar Association; and *Tara Rice*, New York City, for The Lesbian, Gay, Bisexual and Transgender Law Association of Greater New York, amici curiae.

*Liberty Counsel*, Longwood, Florida (*Rena M. Lindevaldsen* and *Mathew D. Staver* of counsel), and *American Center for Law & Justice*, New Milford, Connecticut (*Vincent P. McCarthy* and *Kristina J. Wenberg* of counsel), for Ruben Diaz and others, amici curiae.

*Cravath, Swaine & Moore LLP*, New York City (*Gary A. Bornstein* of counsel), and *Empire State Pride Agenda*, Albany (*Ross D. Levi* of counsel), for Empire State Pride Agenda and others, amici curiae.

*Alliance Defense Fund*, Scottsdale, Arizona (*Byron Babione, Benjamin W. Bull, Glen Lavy, Randall Wenger* and *Dale Schowengerdt* of counsel), for Family Research Counsel, amicus curiae.

*Norman L. Reimer*, New York City (*Ivan J. Dominguez, Kathryn Shreeves* and *Jean M. Swieca* of counsel), for New York County Lawyers' Association; *H. Alexander Robinson*, Washington, DC, for National Black Justice Coalition; and *Nadine C. Johnson*, New York City (*Cornett L. Lewers* of counsel), for Metropolitan Black Bar Association, amici curiae.

*Richard E. Barnes*, Albany, and *Paul Benjamin Linton*, Northbrook Illinois, for New York State Catholic Conference, amicus curiae.

*Debevoise & Plimpton LLP*, New York City (*Kristin D. Kiehn, Eliza M. Sporn* and *Jennifer E. Spain* of counsel), for Parents, Families & Friends of Lesbians and Gays, Inc., and others, amici curiae.

*Suzanne B. Goldberg*, New York City; *Arnold & Porter LLP*, New York City (*Robert C. Mason* and *Dorothy N. Giobbe* of counsel); and *Arnold & Porter LLP*, Washington, DC (*Helene B. Madonick, Jennifer S. Brannan, Leslie M. Hill* and *Lisa Adelson* of counsel), for Professors of History and Family Law, amici curiae.

*Marriage Law Foundation*, Provo, Utah (*William C. Duncan* and *Monte N. Stewart* of counsel), and *Adam Anderson*, New York City, for United Families International, amicus curiae.

*Willkie Farr & Gallagher LLP*, New York City (*Martin Klotz, Yuriko Tada* and *Suzanne C. Hess* of counsel), for Women's Bar Association of the State of New York and others, amici curiae.

*Fried, Frank, Harris, Shriver & Jacobson LLP*, New York City (*Bonnie Steingart, Jonathan F. Lewis, Jennifer L. Colyer, Edward J. Jacobs* and *Tico A. Almeida* of counsel), for Religious Organizations and others, amici curiae.

## OPINION OF THE COURT

WILLIAMS, J.

Plaintiff same-sex couples seek to enter into civil marriage in New York City. Defendant Victor Robles, the City Clerk of the City of New York, administers the Marriage License Bureau and is responsible for issuing and recording marriage licenses and solemnizing civil marriages in New York City. In March 2004, each of the plaintiff couples applied for a marriage license at

defendant's office. Their applications were denied on the ground that "New York State law does not authorize this office to grant marriage licenses to same-sex couples."

Plaintiffs brought an action in Supreme Court, New York County seeking declaratory and injunctive relief arguing that the Domestic Relations Law denies them their rights to equal protection and due process as guaranteed by the Constitution of the State of New York. They alleged that aside from the fact that they are same-sex couples, they are otherwise legally qualified to marry under New York State law. Plaintiffs eventually moved, and defendant cross-moved, for summary judgment. The court granted the motion and denied the cross motion, holding that the Domestic Relations Law violated the equal protection and due process provisions of the New York State Constitution, and that the words "husband," "wife," "bride," and "groom" as used in the relevant sections of the Domestic Relations Law should be construed to apply equally to either men or women. The court permanently enjoined defendant from denying a marriage license to any couple solely on the ground that the couple is comprised of persons of the same sex.

The court agreed with the New York State Attorney General and the Corporation Counsel of the City of New York that the Domestic Relations Law does not and was not intended to authorize same-sex marriage. It reasoned, among other things, that the fundamental right to marry, as recognized by federal and New York State due process case law, is both a liberty right and a privacy right and includes the right to choose whom one marries. Thus, the appropriate test of the Domestic Relations Law's constitutionality in this regard should be strict scrutiny, which requires that the State demonstrate a compelling state interest for the statutory classification and that the legislation be narrowly tailored to meet that interest. The court found that the asserted state interests, fostering traditional heterosexual marriage and avoiding problems raised by other jurisdictions' failure to grant comity to same-sex marriages, did not meet the test. It stated that the issue as posed by defendant, whether plaintiffs had a fundamental right to same-sex marriage, was a misstatement of the issue according to the United States Supreme Court in *Lawrence v Texas* (539 US 558 [2003]).

The court also found that the Domestic Relations Law violated the Equal Protection Clause of the State Constitution in that it discriminates against plaintiffs on the basis of sexual orientation and rationally serves no legitimate state purpose. Finally,

the court rejected the argument that the issue of whether to permit same-sex marriage is one in which the courts should defer to the Legislature, finding that it was well within its mandate in ruling on the statute's constitutionality and that the United States Supreme Court rejected the same argument in *Loving v Virginia* (388 US 1 [1967]), where it struck down an antimiscegenation law.

We find that the motion court erred in granting plaintiffs summary judgment and finding the provisions of the Domestic Relations Law unconstitutional to the extent that they do not permit same-sex marriage. However, we find it even more troubling that the court, upon determining the statute to be unconstitutional, proceeded to rewrite it and purportedly create a new constitutional right, an act that exceeded the court's constitutional mandate and usurped that of the Legislature.

As we stated in *Raum v Restaurant Assoc.* (252 AD2d 369, 370 [1998], *appeal dismissed* 92 NY2d 946 [1998]), "[s]ince it is not within the judicial province to redefine terms given clear meaning in a statute, [a] plaintiff's sole recourse [in such instance] lies in legislative action" (citation omitted; *see also Greenwald v H & P 29th St. Assoc.*, 241 AD2d 307 [1997]; *Matter of Cooper*, 187 AD2d 128 [1993], *appeal dismissed* 82 NY2d 801 [1993]). Here, the relevant provisions of the Domestic Relations Law, despite the absence of an express prohibition against same-sex marriage, clearly do not contemplate such unions (2004 Ops Atty Gen No. I 2004-1, at 1005 ["the inclusion in the DRL of gender-specific terms to describe parties to a marriage, as well as the historical context of its enactment, indicates that the Legislature did not intend to authorize same-sex marriage"]). Generally, in such circumstances, "courts [should not] correct supposed . . . omissions or defects in legislation" (McKinney's Cons Laws of NY, Book 1, Statutes § 73, at 148 [1971]).

The role of the courts is "to recognize rights that are supported by the Constitution and history, but the power to create novel rights is reserved for the people through the democratic and legislative processes" (*Goodridge v Department of Pub. Health*, 440 Mass 309, 356, 798 NE2d 941, 978 [2003] [Spina, J., dissenting]). Deprivation of legislative authority, by judicial fiat, to make important, controversial policy decisions prolongs divisiveness and defers settlement of the issue; it is a miscarriage of the political process involved in considering such a policy change (*see* Ruth Bader Ginsburg, *Speaking in a Judicial Voice*, 67 NYU L Rev 1185, 1205-1208 [1992] [urging a mea-

sured approach in judicial decisionmaking and citing in contrast the Supreme Court's *Roe v Wade* decision (410 US 113 [1973]), which prematurely ended the political process for legislative change on the abortion issue and resulted in protracted controversy]).

The power to regulate marriage lies with the Legislature, not the Judiciary. "[T]he Legislature in dealing with the subject of marriage has plenary power" (*Fearon v Treanor*, 272 NY 268, 271 [1936], *appeal dismissed* 301 US 667 [1937]). Hence,

> "[i]t is the Legislature that is the appropriate body to engage in the studied debate that must necessarily precede the formulation of social policy with respect to same-sex marriage and the decision to extend any or all rights and benefits associated with marriage to same-sex couples, and, in turn, the amendment or expansion of the laws presently governing the institution of marriage in New York" (*Matter of Shields v Madigan*, 5 Misc 3d 901, 908 [2004]).

> "Rights are defined by the Legislature, not the Judiciary. Plaintiffs must take their request for an alteration in the definition of marriage to the elected officials responsible for drafting the marriage statutes. Judicial intervention is warranted only where the Legislature has placed an unreasonable restriction on access to the legislatively defined right" (*Lewis v Harris*, 2003 WL 23191114, *20 [NJ Super Ct, Law Div, Nov. 5, 2003], *affd* 378 NJ Super 168, 875 A2d 259 [2005]).

The definition of marriage in the Domestic Relations Law expresses an important, long-recognized public policy supporting, among other things, procreation, child welfare and social stability—all legitimate state interests. The motion court's revision of statutory language impermissibly replaces the legislative intent with that of the court. Other New York courts that have ruled recently on the same-sex marriage issue have upheld the statute (*see e.g. Seymour v Holcomb*, 7 Misc 3d 530 [2005]; *Matter of Shields v Madigan*, 5 Misc 3d 901 [2004]).

The Domestic Relations Law provisions regarding marriage do not violate the due process and equal protection provisions of the New York State Constitution (NY Const, art I, §§ 6, 11). Marriage, defined as the union between one man and one woman, is based upon important public policy considerations

and has been recognized as a fundamental constitutional right (*Zablocki v Redhail*, 434 US 374, 383 [1978]; *Skinner v Oklahoma ex rel. Williamson*, 316 US 535, 541 [1942]; *see also Washington v Glucksberg*, 521 US 702, 720 [1997]; *Griswold v Connecticut*, 381 US 479, 486 [1965]). These considerations are based on innate, complementary, procreative roles, a function of biology, not mere legal rights. "[T]he reasons justifying the civil marriage laws are inextricably linked to the fact that human sexual intercourse between a man and a woman frequently results in pregnancy and childbirth" (*Goodridge*, 440 Mass at 357 n 1, 798 NE2d at 979 n 1 [Sosman, J., dissenting]).

The legislative policy rationale is that society and government have a strong interest in fostering heterosexual marriage as the social institution that best forges a linkage between sex, procreation and child rearing. It systematically regulates heterosexual behavior, brings order to the resulting procreation and ensures a stable family structure for the rearing, education and socialization of children (*Goodridge,* 440 Mass at 381, 798 NE2d at 995 [Cordy, J., dissenting]). Marriage promotes sharing of resources between men, women and the children that they procreate; provides a basis for the legal and factual assumption that a man is the father of his wife's child via the legal presumption of paternity plus the marital expectations of monogamy and fidelity; and creates and develops a relationship between parents and child based on real, everyday ties. It is based on the presumption that the optimal situation for child rearing is having both biological parents present in a committed, socially esteemed relationship (*Reno v Flores*, 507 US 292, 310 [1993] [marriage allows the state to express a preference for biological parents "whom our society . . . (has) always presumed to be the preferred and primary custodians of their minor children"]). The law assumes that a marriage will produce children and affords benefits based on that assumption. It sets up heterosexual marriage as the cultural, social and legal ideal in an effort to discourage unmarried childbearing and to encourage sufficient marital childbearing to sustain the population and society; the entire society, even those who do not marry, depends on a healthy marriage culture for this latter critical, but presently undervalued, benefit. Marriage laws are not primarily about adult needs for official recognition and support, but about the well-being of children and society, and such preference constitutes a rational policy decision. Thus, society and government have reasonable, important interests in encouraging heterosex-

ual couples to accept the recognition and regulation of marriage.

Plaintiffs' challenge to the statute on equal protection grounds is without merit. They concede that the Domestic Relations Law marriage provisions do not discriminate on the basis of gender; the Domestic Relations Law treats the members of both genders exactly the same in terms of whom they may marry (*Seymour v Holcomb*, 7 Misc 3d at 534; *Matter of Shields v Madigan*, 5 Misc 3d at 906). The statute does create a classification on the basis of sexual orientation, but in a manner permissible under the applicable equal protection analysis, that is, the rational basis test (*see Romer v Evans*, 517 US 620, 631 [1996]; *Matter of Valentine v American Airlines*, 17 AD3d 38, 42 [2005]; *Cooper*, 187 AD2d at 133-134). Sexual orientation is not subject to one of the stricter equal protection analyses (*Romer*, 517 US at 631-633; *Matter of Valentine*, 17 AD3d at 42). In rational basis analysis, the statute receives a strong presumption of validity and the burden is on claimant to show otherwise; there is no burden on the state to produce evidence sustaining the rationality of the statute (*Heller v Doe*, 509 US 312, 319-320 [1993]; *Affronti v Crosson*, 95 NY2d 713, 719 [2001], *cert denied sub nom. Affronti v Lippman*, 534 US 826 [2001]. Justice O'Connor, concurring in *Lawrence v Texas* (539 US at 585), opines that a statute providing for the traditional institution of marriage could withstand rational basis analysis, and recent New York decisions, among others, have so held (*see e.g. Seymour v Holcomb*, 7 Misc 3d at 535-536; *Matter of Shields v Madigan*, 5 Misc 3d at 907).

Plaintiffs fail to carry their burden of demonstrating "that the legislative facts on which the [statutory] classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker" (*Affronti v Crosson, supra* at 719 [citation and internal quotation marks omitted]). They do not dispute the Legislature's assumptions concerning the advantages of encouraging the rearing of children by both biological parents. Their argument that the statute does not have a rational basis because it allows heterosexual couples unable or unwilling to have children to marry ignores precedent holding that the classification created by a statute need not be perfect (*see Massachusetts Bd. of Retirement v Murgia*, 427 US 307, 314 [1976]; *Matter of Davis*, 57 NY2d 382, 388 [1982]). Nor does it lack rational basis because it addresses one legitimate policy interest or problem (regulating heterosexual marriage) over

others even if they are related to the same subject. The legislative process involves setting priorities, making difficult decisions, making imperfect decisions and approaching problems incrementally, and rational basis analysis does not require that a legislature take the ideal or best approach (*Heller v Doe*, 509 US at 321; *FCC v Beach Communications, Inc.*, 508 US 307, 315-316 [1993]). Finally, there is no requirement in rational basis equal protection analysis that the government interest be furthered by both those included in the statutory classification and by those excluded from it (*see People v Whidden*, 51 NY2d 457, 461 [1980], *appeal dismissed for want of a substantial federal question* 454 US 803 [1981]).

Plaintiffs' claimed reliance on the fundamental right to marry is without merit. The United States Supreme Court recognizes traditional, heterosexual marriage as a fundamental right pursuant to both equal protection and substantive due process liberty and privacy doctrines (*Washington v Glucksberg*, 521 US at 720; *Zablocki v Redhail*, 434 US at 383; *Loving v Virginia*, 388 US at 12; *Griswold v Connecticut*, 381 US at 486; *Skinner v Oklahoma ex rel. Williamson*, 316 US at 541). New York apparently recognizes a parallel right (*see e.g. Levin v Yeshiva Univ.*, 96 NY2d 484, 500 [2001] [G.B. Smith, J., concurring]; *Matter of Doe v Coughlin*, 71 NY2d 48, 52-53 [1987], *cert denied* 488 US 879 [1988]; *People v Onofre*, 51 NY2d 476, 486 [1980], *cert denied* 451 US 987 [1981]; *Cooper v Morin*, 49 NY2d 69, 80 [1979], *cert denied sub nom. Lombard v Cooper*, 446 US 984 [1980]; *Matter of Mary of Oakknoll v Coughlin*, 101 AD2d 931, 932 [1984]). Fundamental rights are defined as those "which are, objectively, 'deeply rooted in this Nation's history and tradition' . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed' " (*Washington*, 521 US at 720-721). Courts are admonished to " 'exercise the utmost care' in conferring fundamental-right status on a newly asserted interest lest we transform the liberty protected by due process into judicial policy preferences rather than principles born of public debate and legislative action" (*Standhardt v Superior Ct. ex rel. County of Maricopa*, 206 Ariz 276, 284, 76 P3d 451, 459 [2003], quoting *Washington*, 521 US at 720). No appellate court, other than the *Goodridge* court, has held that a fundamental right exists to same-sex marriage (*but see e.g. Dean v District of Columbia*, 653 A2d 307, 333 [1995] [same-sex marriage not a fundamental right protected by the Due Process Clause]; *Standhardt*, 206 Ariz at 284, 76 P3d at

459 ["same-sex marriages are neither deeply rooted in the legal and social history of our Nation or state nor are they implicit in the concept of ordered liberty"]; *Lawrence v Texas*, 539 US at 585 [O'Connor, J., concurring] [opines that on a same-sex bias challenge traditional marriage statute could withstand rational basis analysis]). Thus, we reject plaintiffs' argument in support of a fundamental right. Their reliance on *Loving v Virginia* (388 US 1 [1967]) is misplaced, since that Court held that the intent of the antimiscegenation statute directly conflicted with the fundamental right to be free from racial discrimination based on the Equal Protection Clause, as well as with the fundamental right to traditional marriage based on substantive due process (*Loving* at 11-12; *see also Perez v Sharp*, 32 Cal 2d 711, 198 P2d 17 [1948] [California antimiscegenation statute violated the Equal Protection Clause]).

The motion court's decision, by redefining traditional marriage, usurped the Legislature's mandated role to make policy decisions as to which type of family unit works best for society and therefore should be encouraged with benefits and other preferences. It effectively dismantled the legislative construct and treats all intimate and dependent relationships as equal. This is an impermissible intrusion by the Judiciary upon the legislative domain. The question of what statutory recognition, if any, same-sex couples should receive in New York is one that must be referred to the Legislature in accordance with its historical role.

Having ruled as it did, the motion court should have, as the Vermont and Massachusetts courts did in *Baker v State* (170 Vt 194, 744 A2d 864 [1999]) and *Goodridge v Department of Pub. Health* (440 Mass 309, 798 NE2d 941 [2003]), respectively, suspended the effect of its decision for a reasonable period of time and retained jurisdiction giving the Legislature the opportunity to consider and enact legislation consistent with the alleged constitutional mandate. "A sudden change in the marriage laws or the statutory benefits traditionally incidental to marriage may have disruptive and unforeseen consequences" (*Baker*, 170 Vt at 225, 744 A2d at 887). "The implementation by the Vermont Legislature of a constitutional right expounded by this Court pursuant to the Vermont Constitution . . . is not an abdication of judicial duty, it is the fulfillment of constitutional responsibility" (*Baker*, 170 Vt at 228, 744 A2d at 888).

Accordingly, the order and judgment of the Supreme Court, New York County (Doris Ling-Cohan, J.), entered February 7,

2005, which granted plaintiffs' motion for summary judgment; denied defendant's cross motion for summary judgment; adjudged and declared that the Domestic Relations Law violates article I, §§ 6 and 11 of the New York State Constitution; adjudged and declared that the words "husband," "wife," "groom," and "bride," as they appear in the relevant sections of the Domestic Relations Law, are and shall be construed to apply equally to either men or women; and ordered that defendant be permanently enjoined from denying a marriage license to any couple solely on the ground that the two persons in that couple are of the same sex, should be reversed, on the law, without costs, the judgment vacated, plaintiffs' motion for summary judgment denied, defendant's cross motion for summary judgment granted and a declaration issued in defendant's favor that Domestic Relations Law §§ 10, 12 and 15 (1) (a), and the other relevant sections of the Domestic Relations Law at issue, are constitutional and valid.

CATTERSON, J. (concurring). I concur with the majority that the question of same-sex unions is the province of the Legislature rather than the Judiciary. The issue presents no opportunity for the development of the common law in New York but nonetheless it poses significant constitutional questions. I write separately to amplify this constitutional dimension.

Cardozo observed that:

> "It is a question of degree whether the law which takes my property and limits my conduct, impairs my liberty unduly. So also the duty of a judge becomes itself a question of degree, and he is a useful judge or a poor one as he estimates the measure accurately or loosely. He must balance all his ingredients, his philosophy, his logic, his analogies, his history, his customs, his sense of right, and all the rest, and adding a little here and taking out a little there, must determine, as wisely as he can, which weight shall tip the scales." (Benjamin N. Cardozo, The Nature of the Judicial Process, at 161-162 [1921].)

The scales are historically unbalanced at the start of any examination of same-sex unions by the weight of history, custom, and significant United States Supreme Court precedent favoring the defendant.

The common-law concept of marriage as a union between a man and a woman has deep roots in American jurisprudence.

More than a century ago in *Murphy v Ramsey* (114 US 15 [1885]), the Supreme Court held that polygamists and bigamists could be denied the right to vote in the Territory of Utah. Although the language employed by the Court may appear anachronistic, the sentiments expressed the ideals of the age and accurately reflected the common law concerning matrimony.

> "[N]o legislation can be supposed more wholesome and necessary in the founding of a free, self-governing commonwealth, fit to take [its] rank as one of the co-ordinate states of the Union, than that which seeks to establish it on the basis of the family, as *consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony.*" (*Id.* at 45 [emphasis added].)

The concept of marriage has traditionally been accepted by courts throughout the United States as the union of a man and a woman. Any change in that frequently articulated heterosexual construct would be a revolution in the law rather than evolution.

In an effort to avoid the revolutionary nature of the concept of same-sex unions, the dissent, the plaintiffs, various amici, and the motion court have consistently characterized same sex unions as implicating the right to marry which is a fundamental right; and have argued that any infringement of that right triggers a strict scrutiny analysis. In my view, this analysis is overbroad and flawed. In determining whether an asserted liberty interest or right should be regarded as "fundamental" for purposes of substantive due process analysis under the Fourteenth Amendment, the Supreme Court has consistently applied a two-pronged test. First, there must be a "careful description" of the asserted fundamental liberty interest. (*Washington v Glucksberg*, 521 US 702, 721 [1997] [internal quotation marks omitted].) Second, the interest, so described, must be firmly rooted in the "Nation's history, legal traditions, and practices." (*Id.* at 710; *see Lawrence v Texas*, 539 US 558, 593 [2003] [Scalia, J., dissenting]; *United States v Salerno*, 481 US 739, 751 [1987].) In *Glucksberg*, the Supreme Court characterized the asserted liberty interest as "a right to commit suicide which itself includes a right to assistance in doing so." (521 US at 723.) The Court distinguished this from "a liberty interest in determining the time and manner of one's death," "a right to die," "a liberty to choose how to die," "[a] right to choose a human, digni-

fied death" or "[a] liberty to shape death." (521 US at 722 [citations and internal quotations marks omitted].)

The precision with which the Supreme Court in *Glucksberg* defined the nature of the interest being asserted as deserving of constitutional protection was not novel for the Court. In many previous cases the Court utilized a similarly precise analysis for substantive due process. (*See e.g. Reno v Flores*, 507 US 292, 302 [1993] [describing alleged right as "the . . . right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution," not whether there is a right to "freedom from physical restraint," "a right to come and go at will" or "the right of a child to be released from all other custody into the custody of its parents, legal guardian, or even close relatives"]; *Collins v Harker Heights*, 503 US 115, 126 [1992] [describing asserted interest as a government employer's duty "to provide its employees with a safe working environment"]; *Cruzan v Director, Mo. Dept. of Health*, 497 US 261, 277, 279 [1990] [declining to decide whether there is a "right to die," but assuming that the Constitution grants competent persons "a constitutionally protected right to refuse lifesaving hydration and nutrition"]; *Michael H. v Gerald D.*, 491 US 110, 127 n 6 [1989] [plurality op] [focusing on "historical traditions specifically relating to the rights of an adulterous natural father," rather than on whether "parenthood," "family relationships," "personal relationships" or "emotional attachments in general" are interests that have historically been recognized and protected (internal quotation marks omitted)].) Thus, the Court has consistently rejected the broad categorization of protected rights advocated by the plaintiffs, certain amici, and the court below.

Similarly, New York courts have focused on the specific interest being asserted, rather than on a more general and vague formulation of that interest. For example, following the reasoning on *Cruzan*, the Court of Appeals has held that under article I, § 6 of the New York Constitution, a person has a liberty interest in refusing unwanted medical treatment. (*See Rivers v Katz*, 67 NY2d 485, 493 [1986] [recognizing right of involuntarily committed patient to refuse unwanted administration of antipsychotic medication]; *Grace Plaza of Great Neck v Elbaum*, 82 NY2d 10, 15 [1993] [acknowledging state liberty interest in refusing unwanted medical treatment].) Although this interest

has been broadly described by the Second Circuit as a "right . . . to hasten death" (*Quill v Vacco*, 80 F3d 716, 727 [2d Cir 1996], *revd* 521 US 793 [1997]), it clearly does *not* include a right to attempt or commit suicide (*see Matter of Fosmire v Nicoleau*, 75 NY2d 218, 227 n 2 [1990] [distinguishing refusal of life-sustaining treatment from suicide]) or to enlist the aid of another in attempting or committing suicide.

The *Glucksberg* test has been specifically used to determine whether an asserted right or interest is protected by the liberty language of article I, § 6 of the New York Constitution. (*People v Bell*, 3 Misc 3d 773, 779-782 [Sup Ct, Bronx County 2003] [quoting the two-pronged *Glucksberg* test for evaluating substantive due process claims in the course of an opinion recognizing that under both the state and federal due process clauses, defendant had a protectable liberty interest in not being improperly stigmatized as a sexually violent predator]; *see also People v Isaacson*, 44 NY2d 511, 520 [1978], quoting *Snyder v Massachusetts*, 291 US 97, 105 [1934] ["(d)ue process of law guarantees respect for personal immunities 'so rooted in the traditions and conscience of our people as to be ranked as fundamental' "].)

The plaintiffs contend and the motion court agreed that the courts of New York have recognized that "[t]he protections of the New York Constitution extend beyond those found in the Federal Constitution, which sets the floor, but not the ceiling, for the rights of the individual." (7 Misc 3d 459, 473 [2005].) The contention is imprecise. In determining whether a provision in the New York Constitution affords greater rights than a similarly worded provision in the United States Constitution, a

> "noninterpretive analysis attempts to discover, for example, any preexisting State statutory or common law defining the scope of the individual right in question; the history and traditions of the State in its protection of the individual right; any identification of the right in the State Constitution as being one of peculiar State or local concern; and any distinctive attitudes of the State citizenry toward the definition, scope or protection of the individual right." (*People v P. J. Video*, 68 NY2d 296, 303 [1986], *cert denied* 479 US 1091 [1987].)

In *People v Vilardi* (76 NY2d 67, 80 [1990]), Judge Simons in a concurrence accurately observed that

> "[e]ven if the language of the two provisions is the

> same . . . the Court may conclude that a different construction is in order because of noninterpretative considerations [including] whether the right has historically been accorded greater protection in New York than is presently required under the Federal Constitution, whether it is 'of peculiar State or local concern' and whether the State citizens have distinctive attitudes toward the right."

Thus, the protections afforded under the New York Constitution are not simply broader and all-encompassing. The additional protections are tied to a multifaceted analysis of the right asserted, and inter alia, it is in this analysis that the motion court erred.

Plaintiffs have not argued, and the lower court could not find, that New York statutory or common law ever defined the scope of the right to marry to include same-sex unions; that the history and traditions of this state protect a right to enter into a same-sex marriage; that the drafters and ratifiers of the New York Constitution intended to confer such a right distinct from and in addition to whatever right to marry exists under the United States Constitution; or that the citizens of this state have ever taken issue with the definition of the right to marry as one that exclusively involves one man and one woman or have sought to expand the scope of that right to protect same-sex, as well as opposite-sex, marriages. Plaintiffs' failure to allege, much less prove, that any of these factors supports a right to enter into a same-sex marriage is fatal to their due process claim under the State Constitution.

The court below held that specificity in defining the nature of an asserted state due process claim is unnecessary. To support that contention, the court and plaintiffs both rely on *People v Onofre* (51 NY2d 476 [1980], *cert denied* 451 US 987 [1981]) and *Cooper v Morin* (49 NY2d 69 [1979], *cert denied sub nom. Lombard v Cooper*, 446 US 984 [1980].) Neither decision supports that contention in any respect.

The motion court ignored the plain language of *Onofre* that demonstrated it was decided on *federal*, not *state*, constitutional grounds. (*See* 51 NY2d at 483 ["whether the provision of our State's Penal Law that makes consensual sodomy a crime is violative of rights protected by the United States Constitution"].) *Onofre* simply did not hold that there is a fundamental right to engage in "nonmarital sexual intimacy," as the lower court opined. (7 Misc 3d at 477.) If it had, New York's laws

against adultery, incest and prostitution, as well as its laws allowing divorce or separation on the ground of adultery, would all be presumptively *unconstitutional* because, on the lower court's reading of *Onofre*, those laws infringe upon a fundamental constitutional right. (*See* Penal Law §§ 255.17, 255.25, 230.00; Domestic Relations Law § 170 [4]; § 200 [4].)

In *Cooper* the Court utilized a state due process analysis, but the holding that "pretrial detainees are entitled to contact visits of reasonable duration" (*Cooper v Morin*, 49 NY2d at 73) was explicitly narrow. The limited nature of the holding in *Cooper* is evident from the later decision of *Matter of Doe v Coughlin* (71 NY2d 48 [1987], *cert denied* 488 US 879 [1988]), where the Court held that prison inmates have no state or federal constitutional right to conjugal visits. When the issue is properly framed in terms of the right being asserted (i.e., to enter into a same-sex marriage), it is readily apparent, as the lower court candidly acknowledged, that there is no such right under either the Federal or State Constitution. Neither *Onofre* nor *Cooper* lends itself to the expansive interpretation offered by the court below.

Ultimately, the question facing this Court is *not* the question articulated by the court below: whether homosexuals have a fundamental right to marry. It is whether the State or Federal Constitution recognizes a right to enter into a same-sex marriage.

It is beyond cavil that the Supreme Court has recognized a substantive due process right to marry. (*See Loving v Virginia*, 388 US 1 [1967]; *Zablocki v Redhail*, 434 US 374 [1978]; *Turner v Safley*, 482 US 78 [1987].) But the right recognized in these decisions concerned *opposite-sex* and not *same-sex* couples. (*See Loving*, 388 US at 2; *Zablocki*, 434 US at 379; *Turner*, 482 US at 97-98.) The right to marry is limited to opposite-sex couples by implication in a series of Supreme Court cases relating marriage to procreation and childrearing. (*See Skinner v Oklahoma ex rel. Williamson*, 316 US 535, 541 [1942] ["Marriage and procreation are fundamental to the very existence and survival of the race"]; *Meyer v Nebraska*, 262 US 390, 399 [1923] [liberty language in Due Process Clause includes "the right of the individual . . . to marry, establish a home and bring up children"]; *Maynard v Hill*, 125 US 190, 211 [1888] [characterizing the institution of marriage as "the foundation of the family and of society, without which there would be neither civilization nor progress"].)

The Supreme Court has never stated or even implied that the right to marry under the Constitution or federal precedent extends to same-sex couples. And no court, state or federal, has ever held that marriage, traditionally understood, extends to same-sex couples.[1] "Although same-sex relationships are more open and have garnered greater societal acceptance in recent years, same-sex marriages are neither deeply rooted in the legal and social history of our Nation or state nor are they implicit in the concept of ordered liberty." (*Standhardt v Superior Ct.*, 206 Ariz at 284, 77 P3d at 459.) The federal substantive due process right to marry simply does not extend to same-sex unions; nor does any corollary right under the New York State Constitution. Plaintiffs, the motion court and the dissent have failed to cite any precedent in New York that holds that the right to marry applies to same-sex, as well as opposite-sex, unions. Marriage in New York, as elsewhere, has always been understood as a relationship between a man and a woman. Because the *nature* of the state due process right to marry is limited to opposite-sex couples, the lower court's judgment that New York's marriage statutes violate article I, § 6 of the New York Constitution is erroneous.

---

**1.** *See Standhardt v Superior Ct. ex rel. County of Maricopa*, 206 Ariz 276, 283, 77 P3d 451, 458 (Ct App 2003) ("marriage traditionally has involved opposite-sex partners"); *Jones v Hallahan*, 501 SW2d 588, 589 (Ky 1973) ("marriage has always been considered as the union of a man and a woman"); *Goodridge v Department of Pub. Health*, 440 Mass 309, 320, 798 NE2d 941, 953 (2003) (recognizing "the long-standing statutory understanding, derived from the common law, that 'marriage' means the lawful union of a woman and a man"); *Baker v Nelson*, 291 Minn 310, 311, 191 NW2d 185, 185, 186 (1971) (term "marriage" in common usage means "the state of union between persons of the opposite sex"), *appeal dismissed for want of a substantial federal question* 409 US 810 (1972); *De Santo v Barnsley*, 328 Pa Super 181, 186, 476 A2d 952, 954 (1984) ("common law marriage is limited to two persons of opposite sex"); *Baker v State*, 170 Vt 194, 201, 744 A2d 864, 869 (1999) (referring to the "clear legislative assumption" that marriage under state law "consists of a union between a man and a woman"); *Singer v Hara*, 11 Wash App 247, 253, 522 P2d 1187, 1191 (Ct App 1974) (marriage statutes "clearly founded upon the presumption that marriage, as a legal relationship, may exist only between one man and one woman who are otherwise qualified to enter that relationship"), *review denied* 84 Wash 2d 1008 (1974); *Adams v Howerton*, 673 F2d 1036, 1040 (9th Cir 1982) ("term 'marriage' ordinarily contemplates a relationship between a man and a woman"), *cert denied* 458 US 1111 (1982) (immigration case); *Dean v District of Columbia*, 653 A2d 307, 315 (DC Ct App 1995) ("the ordinary understanding of the word 'marriage'—both at the turn of the century when the [District of Columbia] statute was enacted and in modern times when that statute was amended—means the union of two members of the opposite sex").

Plaintiffs next claim that the reservation of marriage to opposite-sex couples discriminates on the basis of sex and sexual orientation and thus violates the equal protection guarantee of the New York Constitution. Article I, § 11 of the New York Constitution provides, in relevant part, that "No person shall be denied the equal protection of the laws of this state or any subdivision thereof." (NY Const, art I, § 11.) Without deciding whether the marriage statutes discriminate on the basis of sex, the motion court agreed with plaintiffs that the statutes discriminate on the basis of sexual orientation and held them unconstitutional on this ground. That holding was also erroneous.

Plaintiffs' equal protection claim is foreclosed by the Supreme Court's summary disposition in *Baker v Nelson* (409 US 810 [1972]). In *Baker v Nelson*, the Minnesota Supreme Court considered a broad-based federal constitutional challenge to a statute which, as interpreted by the trial court and the State Supreme Court, did not permit the issuance of marriage licenses to same-sex couples. (291 Minn 310, 311-313, 191 NW2d 185, 186 [1971].) In that case, petitioners argued, inter alia, that the reservation of marriage to opposite-sex couples discriminated against them in violation of the Equal Protection Clause. (291 Minn at 312, 191 NW2d at 186] [noting petitioners' argument that "restricting marriage to only couples of the opposite sex is irrational and invidiously discriminatory"].) The Minnesota Supreme Court rejected this argument along with petitioners' other claims. (291 Minn at 313-315, 191 NW2d at 187.) Petitioners appealed to the Supreme Court, raising the same federal constitutional claims. The Supreme Court dismissed their appeal for want of a substantial federal question. (*Baker v Nelson*, 409 US 810 [1972].) Under well-established precedent, the dismissal of the appeal in *Baker* for want of a substantial federal question constitutes a *holding* that the challenge was considered by the Court and was rejected as insubstantial. (*See Hicks v Miranda*, 422 US 332, 343-345 [1975].) The dismissal of the appeal is an adjudication on the merits of the federal constitutional claims raised, including due process and equal protection, which lower courts are bound to follow. (*Id.*)[2]

The summary disposition in *Baker v Nelson* controls the disposition of the state equal protection claim brought herein. The

---

2. The dissent urges that *Baker* should not be followed because of "important doctrinal developments" evidenced by *Lawrence*. The *Lawrence* court specifically declined to address the question of same-sex unions, clearly and unequivocally passing on the chance to raise any new doctrinal development.

Court of Appeals has repeatedly held that the equal protection guarantee of article I, § 11 of the New York Constitution (the first sentence of section 11) is no broader in coverage than the Equal Protection Clause of the Fourteenth Amendment. (*See Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 360 n 6 [1985]; *see also Matter of Esler v Walters*, 56 NY2d 306, 313-314 [1982]; *Dorsey v Stuyvesant Town Corp.*, 299 NY 512 [1949], *cert denied* 339 US 981 [1950].) The second sentence of section 11, which prohibits discrimination on the basis of "race, color, creed or religion" obviously has no application here. Thus, for purposes of this case, it is irrelevant that in adding the second sentence of section 11, the 1938 New York Constitutional Convention intended to provide greater protection against discrimination on the basis of "race, color, creed or religion" than had been provided theretofore by the Equal Protection Clause of the Fourteenth Amendment.

Because of this rule of parallel interpretation, a holding of the Supreme Court rejecting as insubstantial an equal protection claim under the Equal Protection Clause necessarily results in rejection of the same state law claim brought under article I, § 11. I agree with the Second Department when it concluded just that in *Matter of Cooper* (187 AD2d 128 [2d Dept 1993] [relying upon *Baker* in holding that the reservation of marriage to opposite-sex couples does not violate the equal protection guarantee of the State Constitution], *appeal dismissed* 82 NY2d 801 [1993].) Even if we were not to give *Baker* preclusive effect, there is no basis to conclude that the reservation of marriage to opposite-sex couples violates the equal protection guarantee of article I, § 11 of the New York Constitution.

For purposes of both state and federal equal protection analysis, "[a] statute which treats males and females differently violates equal protection unless the classification is substantially related to the achievement of an important governmental objective." (*People v Liberta*, 64 NY2d 152, 168 [1984], *cert denied* 471 US 1020 [1985], citing, inter alia, *Craig v Boren*, 429 US 190, 197 [1976]; *see also People v Whidden*, 51 NY2d 457, 460 [1980], *appeal dismissed* 454 US 803 [1981].) The reservation of marriage to opposite-sex couples, however, does not "treat[ ] males and females differently," as plaintiffs conceded below. It is beyond cavil that both men and women may marry persons of the opposite sex; neither may marry anyone of the same sex. Thus, there is no discrimination on account of sex.

The glaring difficulty with plaintiffs' sex discrimination argument, as the Vermont Supreme Court noted, is that "the mar-

riage laws are facially neutral; they do not single out men or women as a class for disparate treatment, but rather prohibit men and women equally from marrying a person of the same sex." (*Baker v State*, 170 Vt at 215 n 13, 744 A2d at 880 n 13 ["(T)here is no discrete class subject to differential treatment solely on the basis of sex; each sex is equally prohibited from precisely the same conduct"].)[3] Other state courts have also rejected the claim that "defining marriage as the union of one man and one woman discriminates on the basis of sex." (170 Vt at 215 n 13, 744 A2d at 880 n 13, citing *Baker v Nelson*, 291 Minn at 312-314, 191 NW2d at 186-187 [1971], *Singer v Hara*, 11 Wash App at 253-255, 522 P2d at 1191-1192 [1974]; *see also Jones v Hallahan*, 501 SW2d at 590; *Dean v District of Columbia*, 653 A2d at 363 n 2 [Steadman, J., concurring] ["(t)he marriage statute applies equally to men and women"]; *Goodridge v Department of Pub. Health*, 440 Mass at 376, 798 NE2d at 991 [Cordy, J., dissenting] [the marriage statute "does not subject men to different treatment from women; each is equally prohibited from precisely the same conduct"].)

Plaintiffs rely on *Loving v Virginia* (388 US 1 [1967]) and *Perez v Sharp* (32 Cal 2d 711, 198 P2d 17 [1948]), for the proposition that facial neutrality does not immunize a statute from constitutional challenge, at least where it can be shown that the statute was enacted with a discriminatory intent.

Unlike the history of the antimiscegenation statutes struck down in *Loving*, however, which clearly stigmatized African-Americans as inferior to Caucasians, plaintiffs identify nothing in the history of New York's marriage statutes suggesting that they were "intended to promote any hostility between the sexes, preserve any unequal treatment as between men and women, or perpetuate any societal or cultural bias with regard to gender." (*Lawrence v State*, 41 SW3d 349, 358 [Tex Ct App 2001], *revd on other grounds* 539 US 558 [2003].) In light of the discriminatory intent with which they were enacted, antimiscegenation laws could not be legally justified by the fact that they applied equally to Caucasians and African-Americans. By way of contrast, there is no evidence that laws reserving marriage to opposite-sex couples were enacted with any intent to discrimi-

---

**3.** The Vermont Supreme Court's decision requiring the State to recognize either marriage or its legal equivalent (civil unions) between members of the same sex was based upon a provision in the Vermont Constitution (the "Common Benefits Clause" [Vt Const, ch I, art 7]) for which there is no analog in the New York Constitution.

nate against either men or women. Accordingly, such laws cannot be equated in a facile manner with antimiscegenation laws.

The *Loving* analogy is inapt on purely logical grounds. The statutes struck down in *Loving* (as well as those in *Perez*) prohibited marriages between members of *different* races, not between members of the *same* race. The equivalent, in the area of sex, of an antimiscegenation statute would not be a statute prohibiting *same*-sex marriages, but one prohibiting *opposite*-sex marriages, an absurdity which no state has ever contemplated. The equivalent in the area of race, of a statute prohibiting same-sex marriage, would be a statute that prohibited marriage between members of the *same* race. Laws banning marriages between members of the same race would be unconstitutional, not because they would "segregate the races and perpetuate the notion that blacks are inferior to whites" (*Lawrence v State*, 41 SW3d at 357), but because there could be no possible rational basis for prohibiting members of the same race from marrying. Laws against same-sex marriage, on the other hand, are supported by multiple reasons set forth infra. The reservation of marriage to opposite-sex couples simply does not discriminate on the basis of sex.

Plaintiffs' reliance on *Loving* is disingenuous for additional reasons. It is a fundamental precept of constitutional law that "[a] racially discriminatory purpose is always sufficient to subject a law to strict scrutiny, even a facially neutral law that makes no mention of race." (*Lawrence v Texas*, 539 US at 600 [Scalia, J., dissenting], citing *Washington v Davis*, 426 US 229, 241-242 [1976].) As demonstrated above, there is no history of constitutional recognition of same-sex unions, let alone absolute constitutional protection for same-sex unions. To elevate the issue of same-sex unions to that of discrimination on the basis of race does little service to the legacy of the civil rights movement, and ignores the history of race relations in this country. How can one consider the horror of the Civil War and the majesty of the Emancipation Proclamation in the same breath as same-sex unions?

Finally, the lower court accepted plaintiffs' claim that the marriage statutes discriminate on the basis of sexual orientation. Reserving marriage to opposite-sex couples, however, does *not* discriminate on the basis of sexual orientation. Homosexuals *may* marry persons of the *opposite* sex, and heterosexuals may *not* marry persons of the *same* sex. As the Hawaii Supreme Court noted, "Parties to 'a union between a man and a woman'

may or may not be homosexuals. Parties to a same-sex marriage could theoretically be either homosexuals or heterosexuals." (*Baehr v Lewin*, 74 Haw 530, 543 n 11, 852 P2d 44, 51 n 11 [1993]; *see Dean v District of Columbia*, 653 A2d at 363 n 1 [Steadman, J., concurring] [agreeing with *Baehr* that "just as not all opposite-sex marriages are between heterosexuals, not all same-sex marriages would necessarily be between homosexuals"]; *Goodridge v Department of Pub. Health*, 440 Mass at 320 n 11, 798 NE2d at 953 n 11.)

I recognize that New York's statutory scheme of reserving marriage to opposite-sex couples may have a greater *impact* upon homosexuals than heterosexuals. Nevertheless, it is fundamental that disparate impact alone is insufficient to invalidate a statute, even with respect to suspect or quasi-suspect classifications such as race and gender. Under well-established federal equal protection doctrine, a facially neutral law (or other official act) may not be challenged on the basis that it has a disparate impact on a particular race or gender unless that impact can be traced back to a discriminatory purpose or intent. The plaintiffs must show that the law was enacted *because of,* not *in spite of*, its foreseeable discriminatory impact. (*See Washington v Davis*, 426 US at 238-248 [rejecting an equal protection challenge to police department's use of a job-related employment test to evaluate verbal skills of employment applicants which a higher percentage of African-Americans failed than Caucasians where there was no showing that racial discrimination entered into the establishment or formulation of the test]; *Arlington Heights v Metropolitan Housing Development Corp.*, 429 US 252, 264-271 [1977] [municipality's refusal to amend zoning ordinance to allow multifamily, low income housing in village where single family homes predominated did not violate the Equal Protection Clause where there was no evidence of discriminatory intent even though such refusal to rezone had a disproportionate impact on African-Americans]; *Personnel Administrator of Mass. v Feeney*, 442 US 256, 271-280 [1979] [upholding veterans' hiring preference in state employment despite its disproportionate impact on women where there was no evidence that the statute conferring the preference was enacted with an intent to discriminate against women, as opposed to nonveterans of either sex].) Contrary to plaintiffs' implication and the dissent's artful urging, nothing in *Lawrence v Texas* overturned this line of authority. In *Lawrence*, the Supreme Court overruled *Bowers v Hardwick* (478 US 186

[1986]), and held that Texas could not criminalize homosexual acts of sodomy committed in private between consenting adults. (539 US 558 [2003].) *Lawrence* was decided on substantive due process grounds, not equal protection grounds. With respect to the due process basis for the decision, the Court in *Lawrence* determined that the Texas same-sex sodomy statute had been enacted with an antihomosexual animus. Plaintiffs have not alleged, much less proved, that the legislators who enacted the New York statutes related to marriage were motivated by a similar animus. In the absence of such allegation and proof, the mere fact that those statutes may have a disproportionate effect on homosexuals is not enough to sustain a challenge under New York Constitution, article I, § 11.

Equal protection jurisprudence under article I, § 11 of the New York Constitution is fully consistent with these principles. (*See Campaign for Fiscal Equity v State of New York*, 86 NY2d 307, 321 [1995] ["an equal protection cause of action based upon a disproportionate impact upon a suspect class requires establishment of intentional discrimination"], citing, inter alia, *Arlington Heights v Metropolitan Housing Development Corp.*, 429 US 252, 265-265 [1977] and *Washington v Davis*, 426 US 229, 240 [1976]; *People v New York City Tr. Auth.*, 59 NY2d 343, 350 [1983] ["purposeful discrimination is a necessary element" of a state equal protection claim based on disparate impact], citing, inter alia, *Personnel Administrator of Mass. v Feeney*, 442 US 256 [1979]; *Board of Educ., Levittown Union Free School Dist. v Nyquist*, 57 NY2d 27, 43-44 [1982] [noting that "(t)he more careful scrutiny standard has been applied when the challenged State action has resulted in intentional discrimination against a class of persons grouped together by reason of personal characteristics, the use of which called into question the propriety of the particular classifications"], *appeal dismissed* 459 US 1138 [1983].)

In its cursory, one-paragraph discussion of plaintiffs' sexual orientation discrimination claim, the lower court cited only one case, this Court's opinion in *Under 21 v City of New York* (108 AD2d 250 [1985]). That reliance was clearly misplaced. In *Under 21*, we considered a challenge to the validity of an Executive Order issued by then-Mayor Koch which, inter alia, forbade city contractors from refusing to hire persons solely on the basis of their "sexual orientation or affectional preference," regardless of their ability to perform their jobs in a satisfactory manner. (108 AD2d at 251.) In our opinion, we stated that "mere

homosexual preference or orientation . . . cannot be used as the basis for denying 'any person' the equal protection of the law." (108 AD2d at 256.) *Under 21* provides no basis on which to invalidate New York's reservation of marriage to opposite-sex couples.

First, unlike the Executive Order at issue in *Under 21*, which was aimed at hiring policies that intentionally discriminated on the basis of a person's "sexual orientation or affectional preference," the marriage statutes are facially neutral with respect to one's sexual orientation, i.e., both heterosexuals and homosexuals may marry someone of the opposite sex, while neither may marry anyone of the same sex. The statutes do not "deny[ ] 'any person' the equal protection of the law" on the basis of his or her "homosexual preference or orientation."

Second, in modifying this Court's judgment, the Court of Appeals held that the Mayor had unlawfully usurped the role of the City Council in establishing legislative policy and that such usurpation could not be defended on the ground that the Mayor was preventing unlawful discrimination. (65 NY2d at 357-364.) With respect to the latter holding, the Court concluded that "the equal protection clause does not ordinarily prevent the city from contracting with private employers who discriminate on this basis [sexual orientation], as the existence of the contract would not, by itself, make the city 'responsible' for the private employment decisions so as to invoke constitutional protections." (*Id.* at 364.) Because no conduct attributable to the City of New York was involved, the Court declined to decide "whether some level of 'heightened scrutiny' would be applied to governmental discrimination based on sexual orientation." (*Id.*)

In *Under 21*, the Court of Appeals essentially determined that this Court need not have decided whether discrimination based on sexual orientation is subject to a higher standard of judicial review than rational basis because, on the facts of the case, that discrimination was not chargeable to the City. That being so, this Court's discussion of the appropriate standard applicable to sexual orientation discrimination was unnecessary to *how* the case should have been decided.

Plaintiffs have not proved, or even alleged, that the marriage statutes were enacted with the *purpose* or *intent* to discriminate against homosexuals. Because the marriage statutes are not subject to an equal protection challenge on that basis, it is unnecessary to determine whether a law that *did* discriminate on

the basis of sexual orientation would be subject to a more rigorous standard of judicial review. That question is not before this Court. The marriage statutes neither infringe upon a fundamental right nor discriminate on the basis of sex or sexual orientation. Accordingly, they must be upheld if they are reasonably related to any legitimate state purpose.

The instant case presents a series of statutory classifications limiting marriage to opposite-sex couples that are not based on a suspect or quasi-suspect characteristic. Furthermore, the classifications do not impermissibly interfere with the exercise of a fundamental right. The classifications "need only rationally further a legitimate state interest to be upheld as constitutional." (*Affronti v Crosson*, 95 NY2d 713, 718-719 [2001], *cert denied sub nom. Affronti v Lippman*, 534 US 826 [2001].) Under this deferential standard of review, the marriage-related statutes at issue are presumed to be constitutional, and plaintiffs have the burden of negating "every conceivable basis which might support it . . . *whether or not the basis has a foundation in the record.*" (*Affronti v Crosson*, 95 NY2d at 719 [citation omitted].) Plaintiffs "must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." (*Id.* [citation and internal quotation marks omitted].) Courts "may even hypothesize the Legislature's motivation or possible legitimate purpose." (*Id.* [citation omitted].) The State "has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is *not subject to courtroom factfinding* and may be based on *rational speculation* unsupported by evidence or empirical data." (*Id.* [citation omitted].) Plaintiffs have failed to carry their burden of proof because they cannot demonstrate that the reservation of marriage to opposite-sex couples is not rationally related to *any* legitimate state purpose. Accordingly, the lower court's judgment that the marriage statutes are irrational and invalid is erroneous and should be reversed.

In addition to "preserving the traditional institution of marriage" (*Lawrence v Texas*, 539 US at 585 [O'Connor, J., concurring in the judgment]), reserving marriage to opposite-sex couples is reasonably related to the State's interests in ensuring a stable legal and societal framework in which children are procreated and raised, and providing the benefits of dual gender parenting for the children so procreated. Courts in New York

have traditionally recognized the legitimacy of these interests.[4] Moreover, it is evident that same-sex couples cannot procreate by themselves[5] or provide dual-gender parenting.[6]

The motion court denied that marriage, as the union of man and woman, uniquely involves the procreation and raising of children. The court observed that "the long-term union of a man and a woman is no longer the only familial context for raising children." (7 Misc 3d at 482.) The court noted that lesbians may conceive through artificial insemination and that, under New York law, both gays and lesbians may adopt children, individually, jointly or as second parents in a same-sex relationship. These observations, however, do not recognize the key difference between how most opposite-sex couples become parents, through sexual intercourse, and how all same-sex couples must become parents, through adoption and assisted

---

4. Marriage is "the cornerstone of the family and therefore the foundation of organized society." (45 NY Jur 2d, Domestic Relations § 1, at 96 [1995], citing *Matter of Lindgren,* 181 Misc 166, 169 [Sur Ct, Kings County 1943] [marriage "provides for our posterity"], *affd* 293 NY 18 [1944] and *Sweinhart v Bamberger,* 166 Misc 256, 260 [Sup Ct, NY County 1937] ["(m)arriage is the foundation of the family and society, without which there would be neither civilization nor progress"], *affd* 254 App Div 665 [1st Dept 1938]; *see also Morris v Morris,* 31 Misc 2d 548, 549 [Sup Ct, Westchester County 1961] ["(m)arriage is . . . a foundation upon which society depends for its very survival"].)

5. *See Singer v Hara,* 11 Wash App at 259, 260, 522 P2d at 1195 ("marriage exists as a protected legal institution primarily because of societal values associated with the propagation of the human race" and "no same-sex couple offers the possibility of the birth of children by their union"); *Dean v District of Columbia,* 653 A2d at 337 (finding that this "central purpose . . . provides the kind of rational basis . . . permitting limitation of marriage to heterosexual couples"); *Standhardt v Superior Ct.,* 206 Ariz at 287-288, 77 P3d at 462-463 ("The State could reasonably decide that by encouraging opposite-sex couples to marry, thereby assuming legal and financial obligations, the children born from such relationships will have better opportunities to be nurtured and raised by two parents within long-term, committed relationships, which society has traditionally viewed as advantageous for children. Because same-sex couples cannot by themselves procreate, the State could . . . reasonably decide that sanctioning same-sex marriages would do little to advance the State's interest in ensuring responsible procreation within committed, long-term relationships.").

6. *See Lofton v Kearney,* 157 F Supp 2d 1372, 1383 (SD Fla 2001) ("a child's best interest is to be raised in a home stabilized by marriage, in a family consisting of both a mother and a father"), *affd sub nom. Lofton v Secretary of Dept. of Children & Family Servs.,* 358 F3d 804, 819 (11th Cir 2004) (legislature may reasonably assume that "children benefit from the presence of both a father and mother in the home"), *cert denied* 543 US 1081 (2005).

reproduction. (*Morrison v Sadler*, 821 NE2d 15, 24 [Ind Ct App 2005].)

> "Becoming a parent by using 'artificial' reproduction methods is frequently costly and time-consuming. Adopting children is much the same. Those persons wanting to have children by assisted reproduction or adoption are, by necessity, heavily invested, financially and emotionally, in those processes. Those processes also require a great deal of foresight and planning. 'Natural' procreation, on the other hand, may occur only between opposite-sex couples and with no foresight or planning. All that is required is one instance of sexual intercourse with a man for a woman to become pregnant." (*Id.*)

In his dissent in *Goodridge v Department of Pub. Health*, Justice Cordy wrote that:

> "Paramount among its many important functions, the institution of marriage has systematically provided for the regulation of heterosexual behavior, brought order to the resulting procreation, and ensured a stable family structure in which children will be reared, educated, and socialized. Admittedly, heterosexual intercourse, procreation, and child care are not necessarily conjoined . . . , but an orderly society requires some mechanism for coping with the fact that sexual intercourse commonly results in pregnancy and childbirth. The institution of marriage is that mechanism.
>
> "The institution of marriage provides the important legal and normative link between heterosexual intercourse and procreation on the one hand and family responsibilities on the other. The partners in a marriage are expected to engage in exclusive sexual relations, with children the probable result and paternity presumed. Whereas the relationship between mother and child is demonstratively and predictably created and recognizable through the biological process of pregnancy and childbirth, there is no corresponding process for creating a relationship between father and child. Similarly, aside from an act of heterosexual intercourse nine months prior to childbirth, there is no process for creating a relationship between a man and a woman as the parents

of a particular child. The institution of marriage fills this void by formally binding the husband-father to his wife and child, and imposing on him the responsibilities of fatherhood. The alternative, a society without the institution of marriage, in which heterosexual intercourse, procreation, and child care are largely disconnected processes, would be chaotic." (440 Mass at 381-383, 798 NE2d at 995-996 [citations omitted].)

I note that the reservation of marriage to opposite-sex couples is also rationally related to the State's interest in providing the benefits of dual-gender parenting. The Legislature could assume that "a recognition of same-sex marriages will increase the number of children experiencing this alternative," and "conceivably conclude that declining to recognize same-sex marriages remains prudent until empirical questions about its impact on the upbringing of children are resolved." (440 Mass at 388, 389, 798 NE2d at 1000 [Cordy, J., dissenting].)

Various amici point out that New York law allows unmarried homosexual couples to adopt. Nevertheless, in reserving marriage to opposite-sex couples, the Legislature reasonably may have believed that the ideal of dual-gender parenting should be preserved whenever possible.

"The fact that the [State] currently allows same-sex couples to adopt . . . does not affect the rationality of this conclusion. The eligibility of a child for adoption presupposes that at least one of the child's biological parents is unable or unwilling, for some reason, to participate in raising the child. In that sense, society has 'lost' the optimal setting in which to raise that child—it is simply not available. In these circumstances, the principal and overriding consideration is the 'best interests of the child,' considering his or her unique circumstances and the options that are available for that child. The objective is an individualized determination of the best environment for a particular child, where the normative social structure—a home with both the child's biological father and mother—is not an option. That such a focused determination may lead to the approval of a same-sex couple's adoption of a child does not mean that it would be irrational for a legislator, in fashioning statutory laws that cannot

make such individualized determinations, to conclude generally that being raised by a same-sex couple has not yet been shown to be the absolute equivalent of being raised by one's married biological parents." (*Goodridge v Department of Pub. Health*, 440 Mass at 389, 798 NE2d at 1000 [Cordy, J., dissenting].)

The motion court fundamentally mischaracterized the issue to be decided on rational basis review of the State's reservation of marriage to opposite-sex couples. The issue is *not* whether "the indisputably central role that marriage plays in human life . . . would be diminished by allowing same-sex couples to marry," or "how the marriages of opposite-sex couples will be adversely affected by allowing same-sex couples to marry," or whether recognition of same-sex marriages would "harm" anyone. (7 Misc 3d at 482, 490.)[7] Rather, the issue is "whether the recognition of same-sex marriage would promote all of the same state interests that opposite-sex marriage does, including the interest in marital procreation. If it would not, then limiting the institution of marriage to opposite-sex couples is rational and acceptable under [the Constitution]." (*Morrison v Sadler*, 821 NE2d at 23.) As the foregoing analysis shows, recognition of same-sex marriage would *not* promote the State's interest in marital procreation, particularly *unintended* procreation from heterosexual intercourse, nor would it promote the State's interest in dual-gender parenting.

Plaintiffs therefore have failed to demonstrate that New York's reservation of marriage to opposite-sex couples is not rationally related to multiple legitimate state purposes. For all the foregoing reasons, the motion court's judgment declaring the statutes unconstitutional should be reversed.

SAXE, J. (dissenting). Civil marriage is an institution created by the state, and the state makes numerous rights and benefits available to those entering into that status. The denial of these

---

7. *See also Standhardt v Superior Ct.*, 206 Ariz at 288, 77 P3d at 463 ("Petitioners lastly argue that the State's limitation of marriage to opposite-sex unions is not reasonably related to its interests in procreation, because excluding same-sex couples from the marriage relationship does not impact procreation. We agree with Petitioners that allowing same-sex couples to marry would not inhibit opposite-sex couples from procreating. But the reasonableness of the State's position is not dependent on the contrary conclusion. Rather, . . . the State does not have the same interest in sanctioning marriages between couples who are incapable of procreating as it does with opposite-sex couples.").

rights and benefits to our state's homosexual residents is contrary to the basic principles underlying our Constitution, our legal system and our concepts of liberty and justice, and perpetuates a deeply ingrained form of legalized discrimination. It misses the point to ask whether the Legislature was purposefully discriminating at the time of its enactment of the challenged statutes. At the time of their enactment the content and purpose of the challenged statutes were founded upon a discriminatory assumption, taken for granted by the Legislature and society generally, that marriage is a right necessarily limited to heterosexuals. The statutes ought to be acknowledged and analyzed as the discriminatory provision they are, and rejected as such.

Plaintiffs, gay men and lesbians involved in long-term romantic and familial relationships with another individual of the same gender, challenge the constitutionality of those provisions of the Domestic Relations Law that, in effect, limit marriage licenses to individuals marrying a person of the opposite gender (see Domestic Relations Law §§ 12, 15 [1] [a]). Specifically, they contend that these statutes violate their rights under both our State Constitution's Due Process Clause (NY Const, art I, § 6), and its Equal Protection Clause (NY Const, art I, § 11). The determination of their claims requires us to consider an array of issues, including the meaning and scope of the constitutional right to marry, what it encompasses, and to whom it applies.

Due Process

In my view, plaintiffs have established a violation of the liberty interests protected by the Due Process Clause of our State Constitution (NY Const, art I, § 6).

While the New York Constitution's Due Process Clause has been held to provide broader rights and liberties than those secured by the federal provision, nevertheless, to determine the extent of protections provided by our State Constitution, our courts often begin their analysis by considering as a baseline, the application of the federal Due Process Clause as interpreted in federal case law (see People v LaValle, 3 NY3d 88, 129 [2004]; Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 159 [1978]; Matter of Jacobs, 98 NY 98 [1885]).

The law as to what interests fall within the constitutional guarantee of liberty under the Federal Constitution has evolved remarkably over the past century, so that the Due Process Clause now covers a broad array of constitutional protections.

Rights which had not previously been contemplated have been recognized and declared to be included within this fundamental right under our Constitution. For example, it was not many decades ago that the right to obtain contraceptive devices without governmental interference was recognized (*see Griswold v Connecticut*, 381 US 479 [1965]; *Eisenstadt v Baird*, 405 US 438 [1972]; *Carey v Population Services Int'l*, 431 US 678 [1977]). And, of course, only very recently did the Supreme Court recognize that the Constitution protects the right to engage in private consensual sexual practices of one's choice, free of governmental prohibitions (*see Lawrence v Texas*, 539 US 558, 574 [2003])—a conclusion the New York State Court of Appeals reached decades earlier (*see People v Onofre*, 51 NY2d 476 [1980], *cert denied* 451 US 987 [1981]). Under current jurisprudence, the liberty protected by the Due Process Clause has been viewed to include generally "personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education" (*Lawrence v Texas, supra* at 574; *see also People v Onofre* at 486).

The right to marry is one of the rights repeatedly recognized during the 20th century as a fundamental right granted by the Due Process Clause. Indeed, the development of case law regarding the right to marry illustrates the derivation of fundamental substantive due process rights from concepts of natural law that preexisted our Constitution. Scholars have recognized that our basic rights are derived from a philosophical tradition of "natural law" that evolved during the 17th and 18th centuries, as expressed in the philosophies of such distinguished thinkers as Montesquieu and John Locke, which postulated that "certain principles of right and justice . . . are entitled to prevail of their own intrinsic excellence" (*see* Tribe, American Constitutional Law § 8-1, at 560 [2d ed], citing Corwin, *The "Higher Law" Background of American Constitutional Law*, 42 Harv L Rev 149, 365 [1928]). As other constitutional scholars have explained, "fundamental rights analysis is simply no more than the modern recognition of the natural law concepts first espoused by Justice Chase in *Calder v. Bull* [3 Dall (3 US) 386 [1798]" (Nowak and Rotunda, Constitutional Law § 11.7, at 433 [6th ed 2000]; *see also* Morrison, *Does the Fourteenth Amendment Incorporate the Bill of Rights?*, 2 Stan L Rev 140, 165 [1949] [arguing that the true source of substantive due process is found "in concepts of natural law"]).

The fundamental right to marry was first mentioned by the United States Supreme Court in 1923, in *Meyer v Nebraska*,

when it was included in a list of the liberty rights guaranteed by the Due Process Clause of the Fourteenth Amendment (262 US 390, 399 [1923]).[1] Then, in *Skinner v Oklahoma ex rel. Williamson* (316 US 535, 541 [1942]), in holding that Oklahoma's Habitual Criminal Sterilization Act violated the Equal Protection Clause since it applied to perpetrators of certain kinds of larceny and not others, the Court termed the right to marry, along with the right to procreate, among the "basic civil rights of man."

Then, in *Loving v Virginia* (388 US 1 [1967]), the Supreme Court struck down miscegenation laws, which had prohibited marriage between Caucasians and individuals of other races.[2] While the analysis employed in *Loving* primarily focused upon the invidious racial discrimination in the statutes' classifications, recognizing them as a blatant violation of the Equal Protection Clause, the Court added that because the laws interfered with the right to marry, they constituted a due process violation as well:

> "These statutes also deprive the Lovings of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment. The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men" (*id.* at 12).

"[T]he fundamental character of the right to marry" was relied upon in *Zablocki v Redhail* (434 US 374, 386 [1978]) in overturning a Wisconsin statute that required any state residents who had child support obligations to obtain court approval before getting married. Not long after, the Court reiterated the fundamental nature of the right to marry in *Turner v Safley* (482 US 78, 95-97 [1987]), in striking down a regulation interfering with the right of a prison inmate to marry.

The New York State Constitution's Due Process Clause also independently protects the "fundamental right to marriage and

---

1. The Fourteenth Amendment guarantee that "No state shall . . . deprive any person of life, liberty, or property, without due process of law" was said in *Meyer v Nebraska* to "denote[ ] not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men" (262 US at 399).

2. Notably, in 1948 the California Supreme Court came to the same conclusions as the Supreme Court later did in *Loving* (*see Perez v Sharp*, 32 Cal 2d 711, 198 P2d 17 [1948]).

family life" (see Cooper v Morin, 49 NY2d 69, 80 [1979], cert denied sub nom Lombard v Cooper, 446 US 984 [1980]), and this right has similarly been relied upon to protect an array of personal and home life decisions. Notably, in Cooper v Morin, the Court, relying on the fundamental rights to marriage and family life and to bear and rear children, held that pretrial jail detainees' rights to direct contact visits, although not protected by the Due Process Clause of the Federal Constitution, are protected by the Due Process Clause of the State Constitution (id. at 73, 81-82; see also McMinn v Town of Oyster Bay, 66 NY2d 544, 547, 549-550 [1985] [zoning ordinance struck down, as violative of the state Due Process Clause, because its definition of "family" was not reasonably related to any legitimate purpose of the ordinance]). Moreover, New York's guarantee of liberty has specifically been held to afford New Yorkers a fundamental right of privacy (see Hope v Perales, 83 NY2d 563, 575 [1994]).

It is therefore unassailable that the Due Process Clause of New York's Constitution, like the Federal Constitution, protects, as fundamental, the right to marry, and more particularly, to marry the person of one's choosing (see Crosby v State of N.Y., Workers' Compensation Bd., 57 NY2d 305, 312 [1982], citing Loving v Virginia, 388 US at 12 [the right to privacy protected by the Due Process Clause encompasses "the decision of whom one will marry"]). Nevertheless, defendant suggests that the right to marry may constitutionally be limited to someone who is a member of the opposite gender. I submit that, as the Supreme Judicial Court of Massachusetts observed, "As both Perez and Loving make clear, the right to marry means little if it does not include the right to marry the person of one's choice, subject to appropriate government restrictions in the interests of public health, safety, and welfare" (Goodridge v Department of Pub. Health, 440 Mass 309, 327-328, 798 NE2d 941, 958 [2003]).

To argue that despite the essential nature of the right to marry, there is no fundamental right to same-sex marriage specifically, is to frame the issue too narrowly. It is instructive to consider the United States Supreme Court's 2003 decision in Lawrence v Texas (supra), which struck down a Texas law prohibiting sodomy between consenting adults of the same gender, overruling its earlier decision in Bowers v Hardwick (478 US 186 [1986]). I recognize that Lawrence is not controlling on this point, as the Court there explicitly stated that "[the

case] does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter" (539 US at 578). Nevertheless, the Court's criticism of the analysis used in the earlier *Bowers* decision is on point. In particular, the Court explained that by framing the question presented as whether homosexuals have a fundamental right to engage in sodomy (*see* 478 US at 191), the *Bowers* court misapprehended the issue to be addressed (*see Lawrence*, 539 US at 566-567).

The same analytical problem occurs here if we frame the question as to whether there is a fundamental right to same-sex marriage. To pose the question that narrowly is to ensure that the answer must be no. However, here, as in *Lawrence*, a fundamental liberty right exists, and the only remaining question is whether this particular group of individuals will be permitted to claim this right. In *Lawrence*, the right at issue was not the right to engage in sodomy, but "the full right to engage in [private consensual sexual] conduct without intervention of the government" (539 US at 578); here, we must approach the question not by asking whether there is a fundamental right to same-sex marriage, but by considering the spectrum of rights that have already been held to fall within the fundamental liberty interests promised by the Constitution.

Under that umbrella, we must look at the established, fundamental right to marry, which, as *Loving* illustrates, includes the right to choose one's spouse. The right claimed by plaintiffs here, to marry the person of their choosing regardless of the gender of the intended spouse, is analogous to the right applied by the Court in *Loving*.[3] Just as the *Loving* court was not recognizing a new fundamental right to interracial marriage, but merely enforcing the long-existent, fundamental right to marry the person of one's choice regardless of either individual's race, plaintiffs here are not asking for a new fundamental right to same-sex marriage, but only that they not

---

**3.** Some have suggested that it is improper to cite to, or rely on, civil rights cases such as *Loving v Virginia* in circumstances involving laws which limit rights on the basis of individuals' sexual orientation (*see e.g.* Kmiec, *The Procreative Argument for Proscribing Same-Sex Marriage*, 32 Hastings Const LQ 653, 671-672 [Fall-Winter 2004-2005]). I disagree. Our nation's shameful history of slavery and the difficult, ongoing battle to eradicate the legacy of that institution, is what justifies using the strictest scrutiny when examining laws creating racial classifications. Nevertheless, the legal reasoning of those decisions is appropriately considered, even if not directly applicable, when statutes create other types of discriminatory classifications.

be excluded from the constitutional protection of the right to choose one's spouse.

Many argue that it is the very definition of the word marriage that imposes the limitation. They suggest that there is no denial of a fundamental right here, since marriage by definition involves one man and one woman. I suggest that, instead, there has existed a longstanding assumption, which has only recently been called into question—that marriage necessarily involves a man and a woman. Once such an assumption is challenged, it must be examined to determine whether it is valid, or just a vestige of another time.

The common understanding of the term marriage has not always been what it is today. The institution of marriage has changed remarkably over the centuries. Long ago it essentially involved a man's acquisition of a woman who functioned as chattel, servant, and producer of children, which children then also became the property of the man. As recently as the mid-19th century, the institution was still defined by the doctrine of coverture, by which a wife's legal identity was essentially merged into that of her spouse (*see* 1 Blackstone, Commentaries on the Laws of England, at 430 [1966 ed]; *Briggs v Mitchell*, 60 Barb 288 [Sup Ct, NY County 1864]).

But, these long-accepted assumptions that once defined marriage have eroded. Over time, many of the patriarchal underpinnings of marriage, such as the "common-law doctrines that a woman was the property of her husband and that the legal existence of the woman was 'incorporated and consolidated into that of the husband' " have been rejected entirely (*see People v Liberta*, 64 NY2d 152, 164 [1984], quoting *Blackstone, supra* [other citations omitted], *cert denied* 471 US 1020 [1985]). The strictly defined gender roles that once dictated the discrete functions of each member of a married couple are no longer hard and fast (*see generally* Kay, *From the Second Sex to the Joint Venture: An Overview of Women's Rights and Family Law in the United States During the Twentieth Century*, 88 Cal L Rev 2017, 2090 [2000]; Shapiro, *"Non-Traditional"* Families in the Courts: The New Extended Family, 11 J Am Acad Matrimonial Law 117 [1993]).

As the institution of marriage has been redefined within modern American society, the law has adjusted accordingly. Indeed, the law and policy of this State have adopted a definition of "family" that includes same-sex couples (*see e.g. Braschi v Stahl Assoc. Co.*, 74 NY2d 201 [1989]). It is fair to say that both the

law and the population generally now view marriage, at least in the abstract ideal, as a partnership of equals with equal rights, who have mutually joined to form a new family unit, founded upon shared intimacy and mutual financial and emotional support. In the face of such a widely held view, the gender of the two partners to a marriage is no longer critical to its definition.

To base a ruling, as did the Minnesota Supreme Court in *Baker v Nelson*, on the observation that "[t]he institution of marriage as a union of man and woman, uniquely involving the procreation and rearing of children within a family, is as old as the book of Genesis" (291 Minn 310, 312, 191 NW2d 185, 186 [1971], *appeal dismissed* 409 US 810 [1972]), fails to recognize the extent to which the fundamental characteristics of the institution have changed, and continue to change, over time. Indeed, the reliance placed by the majority in this case on the term "traditional marriage" to justify its ruling, reflects a determined effort to avoid acknowledging these fundamental changes in the institution of marriage as well as in our society generally.

It is not enough to respond that people have always contemplated opposite-sex couples in relation to the term marriage. Over and over again, assumptions previously taken for granted have been overturned in the context of constitutional law, as society evolves. Indeed, "[a] prime part of the history of our Constitution . . . is the story of the extension of constitutional rights and protections to people once ignored or excluded" (*United States v Virginia*, 518 US 515, 557 [1996]).

For example, state laws imposing racial segregation were based on the assumption that the races were intended to coexist in separate spheres (*see Loving,* 388 US at 3 [quoting opinion of trial judge]; *and see Plessy v Ferguson*, 163 US 537 [1896], *overruled by Brown v Board of Education*, 347 US 483 [1954]). Similarly, discrimination against women was often based upon the asserted belief that women were fundamentally incapable of the functions of men. In 1872, when the United States Supreme Court affirmed a decision by the Illinois Supreme Court refusing to grant a married woman a license to practice law (*see Bradwell v State*, 16 Wall [83 US] 130 [1872]), the three-judge concurrence emphasized that a married woman had no legal existence apart from her husband, rendering her incapable of entering into contracts (*id.* at 141 [Bradley, J., concurring]). Indeed, this oft-quoted concurring opinion relied upon "[t]he paramount destiny and mission of woman . . . to fulfil the noble

and benign offices of wife and mother," which it considered "the law of the Creator" (*id.*). It was not until approximately a century later that the Supreme Court recognized the "long and unfortunate history of sex discrimination" inherent in such case law as the *Bradwell* decision and concurrence (*see Frontiero v Richardson*, 411 US 677, 684 [1973]).

So, although it may be safe to assume that in each of the Supreme Court cases regarding the right to marry, the courts issuing the opinions viewed the term marriage as referring to a man and a woman, the assumptions of previous generations should not be relied upon to limit acknowledged rights to only those categories of people to whom those rights have already been applied.

"[T]imes can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress" (*Lawrence v Texas*, 539 US at 579). Given both the developing law regarding the rights inherent in the due process guarantee of liberty, and our current understanding of the definition and purpose of marriage, it is appropriate to now recognize that limiting the fundamental right to marry to those whose intended spouses are of the opposite sex denies a substantive right to a substantial minority of individuals.

Employing the reasoning that marriage must be limited to heterosexuals because that is what the institution has historically been, merely justifies discrimination with the bare explanation that it has always been this way. As the concurring justice remarked in *Goodridge* (440 Mass at 348, 798 NE2d at 972-973 [Greany, J., concurring]), "To define the institution of marriage by the characteristics of those to whom it always has been accessible, in order to justify the exclusion of those to whom it never has been accessible, is conclusory and bypasses the core question we are asked to decide."

My colleagues, like defendant here, assert that it is solely up to the Legislature to decide whether and when to extend the right to marry to same-sex couples. This contention assumes that the limitation of marriage to opposite-sex couples constitutes merely a legitimate exercise of the State's authority to regulate marriage, in the same manner as it does by setting limitations in such areas as age and consanguinity.

However, the exclusion created by the challenged statutory provisions is far more than a mere regulatory provision. It is a denial to a definable group of individuals, namely, homosexuals, of a right that has been held to be fundamental when applied to

heterosexuals. Notably, even regulations restricting the right to marriage of those with outstanding child support obligations, or of incarcerated convicted felons, were struck down as interfering with a fundamental right (*see Zablocki*, 434 US at 383-391; *Turner v Safley*, 482 US at 95-97). This exclusion of a particular group from a defined fundamental right must be corrected by the courts.

As Professor Laurence Tribe explains:

> "The fatal flaw of this 'legislative solution' argument is that it presumes that fundamental rights can properly be reduced to political interests. . . . 'The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy. . . . [F]undamental rights may not be submitted to vote; they depend on the outcome of no elections. . . .' As in the case of racial segregation, it is often when public sentiment is most sharply divided that the independent judiciary plays its most vital national role in expounding and protecting constitutional rights" (Tribe, American Constitutional Law § 15-10, at 1351 [2d ed], quoting *West Virginia Bd. of Ed. v Barnette*, 319 US 624, 638 [1943]).

It has often been noted that one of the functions of the federal and state constitutions is to safeguard minorities against the tyranny of the majority (*see* Wright, *Two Models of Constitutional Adjudication*, 40 Am U L Rev 1357, 1386 n 182 [1991], citing Ely, Democracy and Distrust, at 135-179 [1980] and Eule, *Judicial Review of Direct Democracy*, 99 Yale LJ 1503, 1508 [1990]). It is precisely because we cannot expect the Legislature, representing majoritarian interests, to act to protect the rights of the homosexual minority, that our courts must take the necessary steps to acknowledge and act in protection of those rights.

Moreover, the assumption that

> "a majority of citizens has the right to insure by legal fiat that marriage continue to have its historical associations . . . contradicts a very basic principle of human dignity, which is that no person or group has the right deliberately to impose personal ethical values—the values that fix what counts as a successful and fulfilled life—on anyone else" (Dworkin, *Who Should Shape Our Culture?*, 15 The Law

School [NYU School of Law magazine] 20, 21 [Autumn 2005]).

The Due Process Clause prohibits states from infringing " 'fundamental' liberty interests . . . , unless the infringement is narrowly tailored to serve a compelling state interest" (*Washington v Glucksberg*, 521 US 702, 721 [1997]). No such compelling state interest is demonstrated here.

As to the argument that this particular right, even if called "fundamental," qualifies only for rational basis scrutiny because it is not "deeply rooted in this Nation's history and tradition" (*see Washington v Glucksberg, supra*), the right at issue is the right to marriage, and few rights are more deeply rooted than that.

### Equal Protection

Plaintiffs' equal protection claim is also meritorious.

Initially, defendant would have this Court reject the equal protection claim at the outset, based purely upon the determination by the Minnesota Supreme Court that Minnesota's exclusion of same-sex couples from the right to marry did not violate the federal Equal Protection Clause, which appeal to the United States Supreme Court was dismissed in 1972 for want of a substantial federal question (*see Baker v Nelson*, 291 Minn 310, 191 NW2d 185 [1971], *appeal dismissed* 409 US 810 [1972]). Defendant contends that because such a dismissal has precedential value (*see Hicks v Miranda*, 422 US 332 [1975]), the decision establishes the federal rule on this particular point. Defendant's reasoning continues that this precedent must be followed in interpreting our State Constitution because the Court of Appeals has remarked that the State Constitution's Equal Protection Clause "is no broader in coverage than the Federal provision" (*see Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 360 n 6 [1985]).

Defendant's argument should be rejected. Notwithstanding the Court's remark regarding the coverage of the State Constitution's Equal Protection Clause, New York requires an *independent* state constitutional analysis. "Despite an identity of text and history, the Court of Appeals on occasion has concluded that greater rights should be accorded under the Equal Protection Clause of the State Constitution" (Kaye, *Dual Constitutionalism in Practice and Principle*, 61 St John's L Rev 399, 416 n 60 [1987]). Moreover, in light of recent developments in the law of equal protection, it would amount to an abdication

of our responsibility to base our ruling upon a 1972 dismissal of an appeal from the Minnesota Supreme Court's decision in *Baker v Nelson*. While summary dismissals operate as federal precedent, they should not be followed when subsequent " 'doctrinal developments indicate otherwise' " (*see Hicks v Miranda*, 422 US at 344). Here, there have been important doctrinal developments in the area of federal equal protection since *Baker v Nelson*, including *Lawrence v Texas* (*supra*) and *Romer v Evans* (517 US 620 [1996]). Indeed, in *Romer*, the Court held that the Equal Protection Clause was violated by an amendment to the Colorado Constitution that prohibited legislative, executive, or judicial action at any level of state or local government designed to protect homosexual persons from discrimination; it said that the amendment "classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else. This Colorado cannot do. A State cannot so deem a class of persons a stranger to its laws" (517 US at 635). Furthermore, by explaining in its decision in *Lawrence v Texas* that it was not deciding "whether the government must give formal recognition to any relationship that homosexual persons seek to enter" (539 US at 578), the Court in effect indicated that it did not view as already decided the issue of whether same-sex couples have the constitutional right to marry.

Where a colorable argument is made that a law denies the equal protection of law to a particular group of individuals, the first determination to be made is the level of scrutiny.

It has been held that when a statute discriminates against a "suspect class[ ]" it is subjected to strict scrutiny, by which the state must demonstrate that the enactment was narrowly drawn and that it serves a compelling interest (*see Regents of Univ. of Cal. v Bakke*, 438 US 265, 357 [1978] [plurality op]; *see also Hodgson v Minnesota*, 497 US 417, 463 [1990] [Marshall, J., concurring in part and dissenting in part]). In general, this standard of review is used for laws that classify people on the basis of their status as members of a racial minority or on the basis of their national origin (*see* Nowak and Rotunda, Constitutional Law § 14.3, at 640 [6th ed]).

An intermediate standard of review, referred to as the "heightened scrutiny" standard, is applied when a viable claim is made under the Equal Protection Clause that the challenged law has a negative impact upon a "discrete and insular minorit[y]" which is being shut out of the political process (*see Matter of Aliessa v Novello*, 96 NY2d 418, 431 [2001], quoting *United*

*States v Carolene Products Co.*, 304 US 144, 153 n 4 [1938]). This standard has been applied since 1976[4] to gender discrimination cases. Under this standard, a classification will only be upheld if it "serve[s] important governmental objectives and [is] substantially related to achievement of those objectives" (*see Craig v Boren*, 429 US 190, 197 [1976]; *see also United States v Virginia*, 518 US 515, 533 [1996]; *People v Liberta*, 64 NY2d at 168).

This heightened scrutiny standard is the one that ought to be employed in this instance, for two reasons. First, the discrimination caused by the challenged statutes here, on the basis of the parties' sexual orientation, properly falls within the broader category of gender discrimination (*see* Koppelman, *Why Discrimination Against Lesbians and Gay Men is Sex Discrimination*, 69 NYU L Rev 197 [1994]). To illustrate, a woman who seeks to marry another woman is denied that right because she is not a man. That the law equally denies both sexes the right to marry one of their own gender does not remove it from the category of gender discrimination, just as equally denying members of different races the right to marry someone of another race is still race discrimination (*see Loving v Virginia*, 388 US at 8).

Secondly, even if classifying individuals on the basis of their sexual orientation were completely distinguishable from gender discrimination, the heightened scrutiny standard should nevertheless apply. Applying the framework laid out in *United States v Carolene Products Co.* (304 US at 152-153 n 4), as recognized by the Court of Appeals in *Matter of Aliessa v Novello* (96 NY2d at 431), homosexuals as a class fall well within the category of a "discrete and insular minorit[y]" which is being shut out of the political process. It cannot be seriously disputed that homosexuals have long been subjected to purposeful discrimination, and—particularly in view of the spate of "Defense of Marriage Acts" being enacted around the country—that the group has been unable to protect itself through the political process (*see* Note, *Heightened Scrutiny Under the Equal Protection Clause: A Remedy to Discrimination Based on Sexual Orientation*, 42 Drake L

---

4. In one 1973 case the Supreme Court applied strict scrutiny in a case of sex discrimination, stating that "classifications based upon sex, like classifications based upon race, alienage, or national origin, are inherently suspect, and must therefore be subjected to strict judicial scrutiny" (*see Frontiero v Richardson*, 411 US at 688), but the subsequent sex discrimination cases appear to have implicitly modified that statement.

Rev 485, 500 [1993]; Note, *An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality*, 57 S Cal L Rev 797 [1984]). To the extent some of the amici who presented briefs to this Court cite Justice Scalia's remark in his dissenting opinion in *Romer v Evans*, that homosexuals as a group "possess political power much greater than their numbers" (517 US at 646) and "have high disposable income" (*id.* at 645), I reject any implication that these purported facts establish the group's ability to protect itself from discrimination. Nor do the strides that *have* been made against discrimination establish that the group has been able to protect itself through the political process; they establish that in some quarters the existence of, and need to combat, such discrimination has been perceived.

Nor does it avail defendant that the challenged statutes were not enacted with the express purpose and intent of discriminating against homosexuals. The discriminatory impetus for the distinction made by the statutes, by which heterosexual couples were viewed as entitled to a benefit from which homosexual couples were excluded, was at the time of enactment so deeply embedded as to be taken for granted by the Legislature. There was no need for an express statement that the Legislature intended to discriminate against homosexuals, or same-sex couples; that intent was implicit.

I recognize that up to now federal courts have generally rejected the use of the heightened scrutiny standard for sexual orientation discrimination claims, and instead applied the rational basis test to such claims (*see e.g. Thomasson v Perry*, 80 F3d 915 [4th Cir 1996], *cert denied* 519 US 948 [1996]; *Jantz v Muci*, 976 F2d 623 [10th Cir 1992], *cert denied* 508 US 952 [1993]; *High Tech Gays v Defense Indus. Sec. Clearance Off.*, 895 F2d 563 [9th Cir 1990]; *Ben-Shalom v Marsh*, 881 F2d 454, 464 [7th Cir 1989], *cert denied sub nom. Ben-Shalom v Stone,* 494 US 1004 [1990]; *Woodward v United States*, 871 F2d 1068, 1076 [Fed Cir 1989], *cert denied* 494 US 1003 [1990]). However, these cases preceded *Romer* and *Lawrence*, and relied largely upon the now-overruled *Bowers v Hardwick* decision, reasoning that since *Bowers* permitted the prosecution of homosexuals for acts of sexual intimacy, it would be incongruous to deem them members of a protected or suspect class. Of course, the overruling of *Bowers* completely undercuts this reasoning.

While one court of this State has ruled that the rational basis standard applied to an equal protection claim by a same-sex do-

mestic partner seeking "surviving spouse" protection under the EPTL (*see Matter of Cooper*, 187 AD2d 128, 133 [2d Dept 1993]), this ruling was similarly made before *Lawrence* and *Romer*. Moreover, the Court in *Cooper* relied upon *Baker v Nelson* (291 Minn at 311, 191 NW2d at 185), the Minnesota decision rejecting a constitutional challenge to the ban on same-sex marriage, on which the Supreme Court dismissed the appeal for want of a substantial federal question (409 US 810 [1972]); as discussed earlier, the continuing viability of that ruling as precedent is also in doubt in view of intervening Supreme Court decisions.

When the heightened scrutiny test is applied, the burden is on the proponent of the statute to show both the existence of an important governmental objective served by the statute, and the substantial relationship between the discriminatory effect of the statute and that objective (*see United States v Virginia*, 518 US at 533; *People v Liberta*, 64 NY2d at 168). We must therefore consider whether defendant has shown that the exclusion of same-sex couples from the marriage laws serves important governmental objectives and is substantially related to achievement of those objectives.

There is no showing here of how the exclusion actually tends to achieve any such important objective. The governmental objective focused on by defendant revolves around encouraging procreation by opposite-sex couples within the context of marriage. Some amici suggest that the challenged statutes properly promote heterosexual marriage, as the institution that best normalizes and stabilizes the acts of procreation and child rearing. Indeed, it is asserted—within the context of the rational basis test—that "[b]ecause same-sex couples cannot by themselves procreate, the State could also reasonably decide that sanctioning same-sex marriages would do little to advance the State's interest in ensuring responsible procreation within committed, long-term relationships" (*see Standhardt v Superior Ct. ex rel. County of Maricopa*, 206 Ariz 276, 288, 77 P3d 451, 463 [Ct App 2003]). However, accepting for argument's sake the merit of encouraging heterosexual couples to have children in the context of marriage rather than outside of it, *for the stability of the family and the benefit of the children,* it remains unexplained how this proposed interest is advanced by *excluding* same-sex couples from marrying.

Promoting the welfare of children is also offered as an objective of the challenged laws. This interest certainly qualifies as an important objective; however, that objective is not substan-

tially related to the discriminatory effect of the statutes. Some amici quote from a dissenting opinion in *Goodridge*, which refers to studies that "document negative consequences that . . . follow children either born outside of marriage or raised in households lacking either a father or a mother figure," and "scholarly commentary contending that children and families develop best when mothers and fathers are partners in their parenting" (*Goodridge*, 440 Mass at 386-387, 798 NE2d at 998-999 [Cordy, J., dissenting]). However, assertions such as these are undermined by the American Psychological Association (APA), which declares that review of the best empirical research available, after evaluating the methodology of each study, reflects that these asserted negative consequences for children raised in same-sex rather than opposite-sex households find no support in the scientific literature (citing e.g. Stacey and Biblarz, *(How) Does the Sexual Orientation of Parents Matter?*, 66 Am Soc Rev 159 [2001]). The APA explains its conclusion that it is the quality of the parenting, rather than the parents' gender or sexual orientation, that determines children's psychological and social adjustment. The children of same-sex couples fare as well as the children of opposite-sex couples, and, indeed, in a study by the American Academy of Pediatrics, the children of same-sex couples showed no gender identity confusion (*see* Perrin and Committee on Psychosocial Aspects of Child and Family Health, *Technical Report: Coparent or Second-Parent Adoption by Same-Sex Parents*, 109 Pediatrics 341 [2002]).

As to any asserted important objective in protecting the traditional institution of marriage, there is no reason to conclude that excluding same-sex couples from the institution is substantially related to any such governmental concern, since it is not apparent how allowing same-sex couples to marry will have any effect on the continued survival of the institution itself, or even its ongoing vitality among heterosexuals. Marriage remains, for all those permitted to enter into it, a "social resource of irreplaceable value . . . [which] enables people together to create value in their lives that they could not create if that institution had never existed" (Dworkin, *Who Should Shape Our Culture?*, at 20).

While some people, including some amici organizations here, assert that "traditional marriage" between men and women will be negatively impacted by allowing same-sex couples to marry, it should be recognized that at one time, some people believed that marriage—and society—would be destroyed if

whites were allowed to marry blacks (*see e.g. Naim v Naim*, 197 Va 80, 88, 84, 87 SE2d 749, 755, 752 [1955] [describing interracial marriage as "harmful to good citizenship" and miscegenation laws protective of the "peace and happiness" of all races], *vacated* 350 US 891 [1955], *adhered to* 197 Va 734, 90 SE2d 849 [1956]). There is no convincing basis supporting the conclusion that excluding same-sex couples from marrying will substantially assist in achieving the protection of the institution generally.

Sometimes a related but slightly more insidious phrasing of this interest in protecting traditional marriage is articulated as an interest in preserving traditional *views* of marriage, or preserving the traditional *definition* of marriage. Rephrased, this would translate to a governmental objective of ensuring that everyone consider marriage to be exclusively a heterosexual institution. Even assuming that the state might have a legitimate interest in preserving the institution of marriage, as an important cornerstone of our social framework, that interest must be distinguished from a desire to preserve traditional assumptions about gender roles. It is marriage itself, the institution by which two individuals join together to form a family unit, that contains the virtues the state may legitimately seek to protect. The traditional limitation of that institution to heterosexual couples is not similarly valuable.

To accept as an "important government objective" the preservation of the "traditional view" of marriage as exclusively heterosexual would be tantamount to accepting the legitimacy of a government proclamation that it has a preference for heterosexuals and intends to enact laws to further that preference. Regardless of whether some, or even many people believe that heterosexuals should be given preferred treatment and provided with institutions and benefits to protect their interests, such a proclamation by the government would be an act of discrimination on the part of the government on a par with the Colorado amendment invalidated in *Romer v Evans (supra)*. " '[A] bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest' " (*Romer*, 517 US at 634, quoting *Department of Agriculture v Moreno*, 413 US 528, 534 [1973]). It certainly cannot be accepted as an *important* governmental objective.

Moreover, a governmental policy of encouraging procreation in the context of marriage and discouraging nonheterosexuals from forming families and having children, would amount to a

statement that we, as a state, choose to give preference to heterosexuals. Such a policy would be contrary to the policies underlying *Matter of Jacob* (86 NY2d 651 [1995]) and *Braschi v Stahl Assoc. Co.* (74 NY2d 201 [1989]), which accept the practical reality that the nature of contemporary family units has changed, and which hold that available rights and protections should cover actual, rather than merely traditional, families.

An explicit policy giving preference to heterosexual couples would also have to be rejected if viewed as an expression of the Legislature's, or the public's, moral beliefs or biases. In *Lawrence v Texas*, while acknowledging the extent to which the anti-sodomy laws were shaped by religious beliefs and "profound and deep convictions accepted as ethical and moral principles," the Court explained that " '[o]ur obligation is to define the liberty of all, not to mandate our own moral code' " (539 US at 571, quoting *Planned Parenthood of Southeastern Pa. v Casey*, 505 US 833, 850 [1992]). Indeed, the *Lawrence* court majority concluded by adopting the reasoning offered in Justice Stevens' dissent in *Bowers*: "the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack" (539 US at 577-578).

Although I have concluded that the heightened scrutiny test is the proper standard to apply, I recognize that the Supreme Court used rational-basis-test language in striking down the Colorado amendment denying protections to homosexuals (*see Romer v Evans*, 517 US 620 [1996]). But, the mere use of the "legitimate basis" language does not support the deduction that the Court held the rational basis test to be the correct approach. Rather, the Court there needed to go no further than the most deferential standard, because it emphatically concluded that a provision which exists only in order to disqualify a class of persons from the right to seek specific protection from the law *has no legitimate basis* (*id.* at 632-633).

However, even if, for argument's sake, we were to adopt the rational basis test as applicable here, that standard is not satisfied. What it comes down to, is this: is there a legitimate state interest in giving only certain individuals, i.e. opposite-sex couples, the right to enter into civil marriage, with all that institution's attendant benefits? Although the rational basis standard is far more deferential, requiring merely that the stat-

ute bear a rational relationship to any[5] legitimate state interest, nevertheless, the statutes' implicit denial to homosexuals of the right to marry the individuals of their choice has no *rational* relationship to any *legitimate* state interest.

While various possible interests have been suggested, in this case and elsewhere, none successfully serves the purpose. As to some, the challenged statutes do nothing to actually advance the claimed state interest, while others are simply not acceptable as *legitimate* reasons for enactment of a statute, inasmuch as they are essentially a mere expression of bias.

Defendant posits that, inasmuch as it is only heterosexual couples who procreate unintentionally, the State has a legitimate particularized interest in fostering marriage between heterosexual couples, in order to promote a stable environment for children born as the result of opposite-sex unions. But, the statute does not do this. Authorizing marriage only for opposite-sex couples does nothing to ensure that children born as the result of opposite-sex unions are raised in a stable family unit by both parents. What the statute does is to merely make it possible for opposite-sex couples to enter into a civil marriage sanctioned by the State. This availability of the institution to opposite-sex couples neither encourages opposite-sex couples to choose to marry, nor encourages them to procreate only within marriage.

Moreover, an avowed interest in promoting procreation within marriage as a means of best protecting children presumes that children are biologically created in only one way, through sex between one man and one woman. To offer this principle as a rational basis for the statutes' limitation presumes that encouraging such couples to form a permanent family bond through marriage, will in turn best protect society's children by ensuring that they will be raised in a stable household by both biological parents. In fact, due to technological advances, along with undisputable changes in our society, this underlying assumption is now far from universal. While opposite-sex marriages are failing at alarming rates, leaving many children of those marriages in embattled one-parent homes, many other children are being conceived in ways that do not fall within this traditional framework, for instance, by a mother and an anonymous sperm donor, or a father and an anonymous egg donor and a surrogate mother. The stability of the families in which

---

**5.** Indeed, the court may hypothesize on its own the Legislature's motivation or possible legitimate purpose (*see Affronti v Crosson*, 95 NY2d 713, 719 [2001], *cert denied sub nom Affronti v Lippman,* 534 US 826 [2001]).

these children are raised is equally important regardless of the process by which the children were conceived, or its participants. And the protection of society's children by promoting their being raised in stable homes bears virtually no relationship to limiting the availability of marriage to heterosexuals only.

There would be greater logic in arguing that there is a governmental interest in giving preferred status to heterosexual couples, based upon a belief that society would rather have children born and raised within families created by opposite-sex couples. However, it is not surprising that defendant does not offer such a policy, since if it were expressed, such a preference to heterosexuals would be an acknowledgment of purposeful discrimination, contrary to the policies underlying such decisions as *Matter of Jacob* (86 NY2d 651 [1995]) and *Braschi v Stahl Assoc. Co.* (74 NY2d 201 [1989]).

"One of the most important purposes to be served by the Equal Protection Clause is to ensure that 'public sensibilities' grounded in prejudice and unexamined stereotypes do not become enshrined as part of the official policy of government" (*People v Santorelli*, 80 NY2d 875, 881 [1992]). What is really at issue here is whether the State may properly dictate that a segment of its residents may not marry the person of their choice. It is time to acknowledge that the limitations being imposed on gay men and lesbians here violate the Constitution's promise of equal protection.

I would therefore affirm the determination of the IAS court.

MARLOW and SWEENY, JJ., concur with WILLIAMS, J.; CATTERSON, J., concurs in a separate opinion; SAXE, J.P., dissents in a separate opinion.

Order and judgment, Supreme Court, New York County (Doris Ling-Cohan, J.), entered February 7, 2005, reversed, on the law, without costs, the judgment vacated, plaintiffs' motion for summary judgment denied, defendant's cross motion for summary judgment granted and a declaration issued in defendant's favor that Domestic Relations Law §§ 10, 12 and 15 (1)(a), and the other relevant sections of the Domestic Relations Law at issue, are constitutional and valid.